UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(KEY WEST DIVISION)

**02 - 10089**

CASE NO: _____

ALDERWOODS GROUP, INC., f/k/a LOEWEN
GROUP INTERNATIONAL, INC., a Delaware
corporation,

        Plaintiff,

v.

JEFFREY W. DEAN, an individual and
DEAN & SONS FUNERAL HOME,
CEMETERY AND CREMATION
SERVICES, INC., a Florida corporation,

        Defendants.

_____/

### COMPLAINT

Plaintiff Alderwoods Group, Inc., f/k/a Loewen Group International, Inc. ("Alderwoods")

sues Jeffrey W. Dean ("JWD") and Dean & Sons Funeral Home, Cemetery and Cremation

Services, Inc. ("Dean & Sons") and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Alderwoods is a Delaware corporation and has its principal place of

business in Cincinnati, Ohio.

2.    Defendant JWD is over the age of 18 and is a resident of Monroe County.

3.    Defendant Dean & Sons is a Florida corporation with its principal place of

business in Monroe County, Florida.

4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28

U.S.C. § 1332, and 28 U.S.C. § 1338.

C A R L T O N   F I E L D S, P. A .
Bank of America Tower at International Place · Suite 4000 · 100 Southeast Second St. · Miami · Florida 33131-9101 · (305) 530-0050

MIA#2213453.02

5.      The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is proper in Monroe County, Florida, pursuant to 28 U.S.C. § 1391, because the events giving rise to this lawsuit occurred in Monroe County, Defendant JWD resides in Monroe County and Dean & Sons has its principal place of business in Monroe County.

## FACTUAL ALLEGATIONS

7.      Upon information and belief, the Dean family has been in the funeral home business for over 100 years.

8.      The Dean family operated Dean-Lopez Funeral Home in Monroe County during much of their history in the funeral industry.

**Plaintiff Purchased the Dean-Lopez Funeral Home in 1992.**

9.      Plaintiff's predecessors established Dean-Lopez Funeral Home, Inc., the corporate entity used to acquire Dean-Lopez Funeral Home, Pritchard Funeral Home, and other assets held by the Dean family, pursuant to the Asset Purchase Agreement referenced below.

10.     Plaintiff Alderwoods is the successor in interest to Dean-Lopez Funeral Home, Inc. through a series of mergers and acquisitions.

11.     As such, in this Complaint, Dean-Lopez Funeral Home, Inc. will be referred to as Plaintiff Alderwoods in the context of the Asset Purchases Agreement which was entered into by Dean-Lopez Funeral Home, Inc., as Alderwoods owns the entities that acquired Dean-Lopez Funeral Home, Inc.

12.     In June of 1992, Alderwoods entered into an Asset Purchase Agreement with Florida Funeral Services, Inc. ("Florida Funeral"), J. Robert Dean and Donna Dean.  J. Robert Dean and Donna Dean were the principals of Florida Funeral which owned Dean-Lopez Funeral

CARLTON FIELDS, P. A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                             2

Home and Pritchard Funeral Home. A copy of the Asset Purchase Agreement is attached hereto as Exhibit "A".

13.     Among the assets purchased was the goodwill associated with Dean-Lopez Funeral Home and Pritchard Funeral Home and the goodwill associated with the Dean Trade Name as set forth in paragraphs 2(g) and 7(e) of the Asset Purchase Agreement.

14.     Pursuant to the Asset Purchase Agreement, Florida Funeral, J. Robert Dean and Donna Dean agreed to grant to Alderwoods a covenant not to compete with Dean-Lopez Funeral Home within Monroe County, Florida for the latter period of 10 years from the closing date or 3 years from the termination of the employment relationship created between Dean family members, including JWD, and Alderwoods.

15.     As set forth in the Asset Purchase Agreement, Florida Funeral, J. Robert Dean and Donna Dean agreed to cause JWD and other members of the Dean Family to grant Alderwoods a covenant not to compete directly or indirectly with Dean–Lopez Funeral Home in Monroe County.

16.     JWD is the son of J. Robert Dean and Donna Dean. For consideration, JWD was paid $5,000.00 as set forth in the Asset Purchase Agreement.

**JWD Entered Into An Employment Agreement Which Included A Non Compete Agreement.**

17.     Originally, in June of 1992, JWD entered into employment and non compete agreements with Dean-Lopez Funeral Home, Inc., as contemplated by the Asset Purchase Agreement. Those employment and non compete agreements were later replaced by a new agreement as set forth below.

18.     On or about January 25, 2000, The Lowen Group International, Inc. (hereinafter,

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                 3

"Alderwoods") entered into an Employment and Release Agreement for Employees Other than Corporate and Country Management ("Employment Agreement") with JWD.   A copy of the Employment Agreement is attached hereto as Exhibit "B".

19.     Although the Employment Agreement refers to The Lowen Group, the true party in interest was Lowen Group International, Inc.  The Lowen Group as written in the Employment Agreement was shorthand for  Lowen Group International, Inc.   JWD's salary during his employment at Dean-Lopez Funeral Home was paid by Lowen Group International, Inc. and he was considered to be an employee of Lowen Group International, Inc.

20.     By an Amended and Restated Certificate of Incorporation dated January 2, 2002, Lowen Group International, Inc. changed its name to Alderwoods Group, Inc.   As such, Alderwoods Group, Inc. is the proper Plaintiff in this action.

21.     Pursuant to paragraph 3.1 of the Employment Agreement, JWD agreed that he would not participate in Competing Businesses, i.e. operation of a funeral home, cemetery or related businesses.  The Employment Agreement defines "Competing Business" as "an Entity which is in competition with any significant line of business conducted by the Company or an Affiliate including, without limitation, the funeral, cemetery or related business." (Employment Agreement, ¶ 1.3)  Paragraph 3.1 of the Employment Agreement provides:

22.     Paragraph 3.1 of the Employment Agreement provides:

> No Participation in Other Businesses.  While employed by the Company, Employee shall not, without the consent of the Board of Directors of the Company, become actively associated with or engaged in any Competing Business.  Employee shall devote Employee's best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of the Company.

23.     Further, JWD agreed that he would not compete with Dean-Lopez Funeral Home

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                          4

and other businesses owned by Alderwoods, including Pritchard Funeral Home and Florida Keys

Crematory ("Alderwoods Businesses").  Paragraph 3.3 of the Employment Agreement provides:

> Noncompetition.  Employee and the Company recognize that Employee's duties will entail the receipt of trade secrets and confidential information, which include not only information concerning the Company's current operations, procedures, suppliers and other contacts, but also its short-range and long-range plans, and that such trade secrets and confidential information may have been developed by the Company and its Affiliates at substantial cost and constitute valuable and unique property of the Company.  **Accordingly, Employee acknowledges that the foregoing makes it reasonably necessary for the protection of the Company's business interests that Employee not compete with the Company or any of its Affiliates during the term of this Agreement and that, for a reasonable and limited period thereafter, the Employee not compete with the Company or any of its Affiliates in the same geographic area in which the Employee performs his services for the Company at the time of his termination of employment with the Company.**  Therefore, (a) during the term of this Agreement, Employee shall not (i) render personal services to any Competing Business in any manner, including, without limitation, as owner, partner, director, trustee, officer, employee, consultant or advisor thereof ("Personal Services") or (ii) have any investment in a Competing Business other than a *de minimis* investment and (b) for two years after Employee's termination of employment, Employee shall not (i) render Personal Services to any Competing Business within a 25 mile radius of the Company-owned site to which Employee regularly reported at the time of Employee's termination of employment with the Company or (ii) have any investment in a Competing Business other than a *de minimis* investment.  For purposes of the preceding sentence, a *de minimis* investment is ownership of less than ½ of 1% of the outstanding equity or debt of any Competing Business.
>
> Notwithstanding any thing herein to the contrary, if Employee shall breach the covenants contained in this Article III, the Company shall have no further obligations to Employee pursuant to this Agreement and may recover from Employee all such damages to which it may be entitled at law or in equity.  In addition, Employee acknowledges that any such breach is likely to result in immediate and irreparable harm to the Company for which money damages are likely to be inadequate.  Accordingly, Employee consents to injunctive and other appropriate equitable relief that the Company may seek to protect the Company's rights under this Agreement.  Such relief may include, without limitation, an injunction to prevent Employee from disclosing any trade secrets or confidential information concerning the Company to any Entity, to prevent any Entity from receiving

CARLTON FIELDS, P.A.
Bank of America Tower at  International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                                          5

from Employee or using any such trade secrets or confidential information and/or to prevent any Entity from retaining or seeking to retain any other employees of the Company.  Employee acknowledges good and sufficient consideration for the noncompetition and nonsolicitation covenants of this Section.

(Emphasis added.)

24.    JWD, who was employed by Alderwoods as a manager, stopped working at Dean-Lopez Funeral Home in May of 2002 and took with him Dean-Lopez Funeral Home records that were the property of Alderwoods.

**JWD Operates Dean & Sons In Competition With Dean Lopez Funeral Home.**

25.    While employed by Alderwoods, JWD began planning and developing a funeral, cremation and burial business to compete with Dean Lopez Funeral Home in violation of the Employment Agreement.  Upon information and belief, JWD who did not terminate his employment with Plaintiff until May of 2002, began planning and developing Dean & Sons as late as March of 2002 but perhaps even earlier.

26.    In March of 2002, Rik Work of Planning & Service Department, a Missouri company, contacted JWD at Dean-Lopez Funeral Home to solicit his help in arranging the funeral service and burial of a woman who died on March 18, 2002.

27.    Although JWD was still employed by Alderwoods, JWD made arrangements for the Martin-Vegue Funeral Home in Marathon to handle the funeral service and Memorial Gardens of the Keys to handle the burial on behalf of Planning & Service Department.

28.    Further evidence that JWD began planning and operating Dean & Son while he was employed by Alderwoods is found in an article printed in The Key West Citizen.  The following appears in the article, titled "Funeral family moves to Big Pine":

When the Memorial Gardens Cemetery and Chapel – 31140 Overseas Highway –

C A R L T O N   F I E L D S , P . A .
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                                    6

on Big Pine was put up for sale, Dean decided to buy it.

"I saw the opportunity and I worked with the family that owned the business and in March I bought it," Dean said.

A copy of the article is attached hereto as Exhibit "C".

29.     JWD incorporated Dean & Sons in April of 2002 and operates Dean & Sons at 31140 Overseas Highway in Big Pine Key, Florida.

30.     Operating through Dean & Sons, Defendants have engaged in and continue to engage in advertising, conducting funeral services, performing cremation services and handling burials within a 25 mile radius of Alderwoods Businesses.

31.     Defendants rely on the goodwill associated with Dean-Lopez Funeral Home, a long time family funeral business, in operating Dean & Sons. In ads and newspaper interviews, JWD specifies that he and other members of the Dean family are no longer affiliated with the Dean-Lopez Funeral Home, Pritchard Funeral Home or any other Key West Funeral Home in an effort to entice customers from Dean-Lopez Funeral Home to Dean & Sons.

32.     Operating through Dean & Sons, JWD has engaged in and continues to engage in performing cremation services, conducting funeral services, handling burials and advertising within a 25 mile radius of Alderwoods Businesses.

33.     Florida Keys Crematory, an Alderwoods Business, is located at Mile Marker 10.5, U.S. Highway in Big Coppitt Key, Florida which is within a 25-mile radius of Dean & Sons.

34.     JWD has performed services within a 25-mile radius of Alderwoods Businesses as evidenced by the numerous obituaries identifying Dean & Sons as being in charge of the funeral services in Key West.  Copies of the obituaries are attached as Composite Exhibit "D".

35.     From about July 2002 through October 2002, Dean & Sons participated in funeral

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                      7

services held at St. Mary's Star of the Sea Church located at 1010 Windsor Lane, St. Peter Catholic Church on Big Pine Key, St. Paul's Episcopal Church located at 410 Duval Street and First Congregational Church located at 527 William Street in Key West which are all within a 25-mile radius of Alderwoods Businesses.

36.     In July of 2002, JWD and Dean & Sons performed services at Southern Keys Cemetery which is located one-half mile from Florida Keys Crematory, an Alderwoods Business.

37.     An investigation by Alderwoods revealed that JWD and Dean & Sons conducted internments at Key West City Cemetery on August 7, 14, 24, October 17, November 1 and 3, 2002. Key West City Cemetery is located within 25 miles of Alderwoods Businesses.

38.     Dean & Sons advertises in many of the same publications in which Alderwoods advertises the services of Dean-Lopez Funeral Home.  For instance, ads for both Dean & Sons and Dean-Lopez Funeral Home appeared on the very same page in the St. Mary Star of the Sea church bulletin.

39.     Dean & Sons' advertising which incorporates the Dean Trade Name and associates itself with the Dean family that has been in the funeral business for over 100 years, seeks to capitalize on the goodwill of Dean-Lopez Funeral Home that Alderwoods purchased. Copies of the advertisements are attached as Composite Exhibit "E".

40.     A Dean & Sons ad appeared in local newspapers with the caption, "The First Name in Family Owned Funeral Services Announces Our New Business".  The text of the ad includes, "We are no longer associated with the Simonton Street business our family created and nurtured through the years.  Our new Big Pine location, from which we can serve all of Monroe County, allows us to continue to provide the family-oriented, personalized services our family is known for ..."

C A R L T O N   F I E L D S , P. A .
Bank of America Tower at  International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                                    8

41.     On July 28, 2002, a Dean & Sons ad appeared in The Key West Citizen and on July 31. 2002 in the Free Press with text that included, "Jeffrey W. Dean & Family Are No Longer Affiliated With Dean Lopez Funeral Home".

42.     On July 29 and 30, 2002 and through much of August of 2002, Dean & Sons ads appeared in the Key West Citizen with the following information: "Representing the 4th & 5th Generations of Funeral Service Providers in Monroe County. Jeffrey W. Dean & Family Are No Longer Affiliated With Dean Lopez Funeral Home, Pritchard Funeral Home, or any Key West Funeral Home.

43.     On August 4, 2002, a Dean & Sons ad appeared in a local newspaper with the caption: "Jeffrey W. Dean & Family Have Opened Dean & Sons Funeral Home Cemetery and Cremations Service to Better Serve All of Monroe County."

44.     On September 12, 2002, a Dean & Sons ad appeared in the News Barometer with text that included, "Jeffrey W. Dean and family are no longer affiliated with Dean-Lopez Funeral Home."

45.     Despite the fact that the Dean family sold the Dean Trade Name to Alderwoods more than 10 years ago, Dean & Sons as well as JWD have used and continue to use the Dean Trade Name and goodwill associated with the Dean Trade Name to mislead the public.

46.     For instance, J. Robert Dean, the patriarch of the Dean family was involved in the funeral business for many years with his sons, including JWD, who served as funeral directors.

47.     JWD, seeking to capitalize on this well-known fact, named his funeral home Dean & Sons. JWD's children are minor children and therefore obviously not involved in the funeral business. By using to Dean & Sons name, JWD seeks to capitalize on the goodwill associated with Dean-Lopez Funeral Home which was operated by J. Robert Dean and his sons.

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                    9

48.     JWD Stole and Converted Plaintiff's Property.

49.     As a manager of Dean-Lopez Funeral Home, JWD was in a position of trust, having access to Plaintiff's bank accounts and credit cards. JWD also had the general ability to make certain discretionary decisions on behalf of Plaintiff in the operation of Dean-Lopez Funeral Home.

50.     During JWD's employment by Plaintiff at Dean-Lopez Funeral Home, JWD stole and converted Plaintiff's property for his personal use and the use of his family members.

51.     JWD made unauthorized purchases of items from gas stations including cigarettes and miscellaneous groceries, and used Plaintiff's funds to have a lock installed at his personal residence, among other things.

52.     Substantial unauthorized and questionable payments were made to JWD, other members of the Dean family and vendors on behalf of Dean family members during JWD's employment by Plaintiff at Dean-Lopez Funeral Home.

53.     Unauthorized or questionable payments were made to vendors  including restaurants, florists, gas stations hardware stores, dance school, dentist, general retail stores, appliance store and carpet cleaning companies, among others.

54.     JWD took funeral records which are the property of Dean-Lopez Funeral Home when he terminated his employment with Plaintiff in May of 2002.

55.     Plaintiff has had to retain undersigned counsel to protect its interests and has agreed to pay them a reasonable fee for their services.

## COUNT I – BREACH OF COVENANT NOT TO COMPETE
## AGAINST DEFENDANTS JEFFREY W. DEAN AND DEAN & SONS

56.     Plaintiff realleges paragraphs 1 through 55 and further alleges as follows:

C A R L T O N  F I E L D S, P. A .
Bank of America Tower at  International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                                    10

57.     Pursuant to the terms of the Employment Agreement, JWD agreed that he would not compete with Plaintiff in the funeral home industry.

58.     The covenant not to compete contained in the Employment Agreement between Plaintiff and JWD is valid and enforceable against Defendants JWD and Dean & Sons.

59.     Defendants breached the covenant not to compete contained in the Employment Agreement by organizing and planning to operate a competing funeral service business while he worked at Dean-Lopez Funeral Home under the employ of Plaintiff.

60.     Defendants breached the covenant not to compete contained in the Employment Agreement by owning and operating Dean & Sons.

61.     Defendants breached the covenant not to compete contained in the Employment Agreement by performing personal services involving funerals, cremations and burials, and by advertising such personal services within a 25 mile radius of Alderwoods Businesses

62.     As a result of Defendants' breaches of the covenant not to compete contained in the Employment Agreement, Plaintiff has been damaged.

WHEREFORE, Plaintiff Alderwoods Group, Inc. requests that this Court enter judgment against Defendants Jeffrey W. Dean and Dean & Sons, including damages, interest, attorney's fees and costs, pursuant to the Employment Agreement and Florida Statutes § 542.335, grant Plaintiff preliminary and permanent injunctive relief, and grant all other relief deemed necessary and just.

## COUNT II – BREACH OF FIDUCIARY
## DUTY AGAINST DEFENDANT JEFFREY W. DEAN

63.     Plaintiff realleges paragraphs 1 through 55 and further alleges as follows:

64.     JWD continued to work at Dean-Lopez Funeral Home as a manager after the

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                           11

business was sold by the Dean family.

65.     As a manager, JWD was in a position of trust, having access to Plaintiff's bank accounts and credit cards.   JWD also had the general ability to make certain discretionary decisions on behalf of Plaintiff in the operation of Dean-Lopez Funeral Home.

66.     While employed as a manager by Plaintiff at Dean-Lopez Funeral Home, JWD converted Plaintiff's assets for his own use and the use of his family members.

67.     Substantial unauthorized and questionable payments were made to JWD, other members of the Dean family and vendors on behalf of Dean family members during JWD's employment by Plaintiff at Dean-Lopez Funeral Home.

68.     Unauthorized or questionable payments were made to vendors including restaurants, florists, gas stations hardware stores, dance school, dentist, general retail stores, appliance store and carpet cleaning companies, among others.

69.     JWD made unauthorized purchases of items from gas stations including cigarettes and miscellaneous groceries, used Plaintiff's funds to have a lock installed at his personal residence and stole funeral records belonging to Plaintiff, among other things.

70.     JWD breached his fiduciary duty to Plaintiff by organizing and planning to operate a competing funeral service business while he was employed by Plaintiff.

71.     JWD breached his fiduciary duty to Plaintiff by converting Plaintiff's assets for his own use and the use of his family members.

72.     As a result of JWD's breaches of his fiduciary duties, Plaintiff has been damaged.

WHEREFORE, Plaintiff Alderwoods Group, Inc. requests that this Court enter judgment against Defendant Jeffrey W. Dean, including damages, interest, attorney's fees and costs, and grant all other relief deemed necessary and just.

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                                    12

## COUNT III – COMMON LAW TRADENAME INFRINGEMENT
### AGAINST DEFENDANTS JEFFREY W. DEAN AND DEAN & SONS

73.     Plaintiff realleges paragraphs 1 through 55 and further alleges as follows:

74.     The Dean Trade Name has acquired special significance in the funeral service industry in Monroe County.

75.     Plaintiff acquired the right to the Dean Trade Name in connection with the operation of its funeral business in 1992.

76.     Since about April of 2002, Defendants have used and continue to use the Dean Trade Name in connection with selling, offering to sell and advertising services of JWD and Dean & Sons which causes confusion, mistake or deception as to the association of Defendants' funeral services through Dean & Sons and Plaintiff's funeral services through Dean-Lopez Funeral Home.

77.     As a result of Defendants' actions, customer confusion may occur.

78.     As such, Plaintiff has been damaged.

WHEREFORE, Plaintiff Alderwoods Group, Inc. requests that judgment be entered against Defendants Jeffrey W. Dean and Dean & Sons for damages, including lost profits, interest, attorneys fees and costs, preliminary and permanent injunction relief, and all other relief deemed necessary and just.

## COUNT IV – VIOLATION OF LANHAM ACT - - 15 U.S.C. § 1125
### AGAINST DEFENDANTS JEFFREY W. DEAN AND DEAN & SONS

79.     Plaintiff realleges paragraphs 1 through 55 and further alleges as follows:

80.     Pursuant to the Asset Purchase Agreement, Plaintiff acquired the right to the Dean family name in connection with the operation of its funeral business.

81.     Defendants are in violation of the Lanham Act, specifically 15 U.S.C.  § 1125,

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                   13

because Defendants used in commerce the Dean Trade Name in advertising their funeral home business which is likely to cause confusion or mistake or deception as to the association of Defendants' funeral home (Dean & Sons) with Plaintiff's funeral home (Dean-Lopez Funeral Home).

82.    Defendants have misrepresented in commercial advertising the nature and characteristics of the services provided by Dean & Sons.

83.    Defendants' advertisements seek to associate Dean & Sons with the reputation of the Dean family that has been in the funeral industry for over 100 years although that reputation properly belongs to Dean-Lopez Funeral Home, creating a likelihood of confusion among consumers.

84.    As a result of Defendants' violations, Plaintiff has been damaged.

WHEREFORE, Plaintiff Alderwoods Group, Inc. requests that judgment be entered against Defendants Jeffrey W. Dean and Dean & Sons for damages, including lost profits, interest, attorneys fees, costs, and preliminary and permanent injunction relief pursuant to 15 U.S.C. § 1116, and all other relief deemed necessary and just.

## COUNT V– CONVERSION AGAINST DEFENDANT JEFFREY W. DEAN

Plaintiff realleges Paragraphs 1 through 55 and further alleges as follows:

85.    While employed as a manager by Plaintiff at Dean-Lopez Funeral Home, JWD converted Plaintiff's assets for his own use and the use of his family members.

86.    Substantial unauthorized and questionable payments were made to JWD, other members of the Dean family and vendors on behalf of Dean family members during JWD's employment by Plaintiff at Dean-Lopez Funeral Home.

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2213453.02                                      14

87.     Unauthorized or questionable payments were made to vendors including restaurants, florists, gas stations hardware stores, dance school, dentist, general retail stores, appliance store and carpet cleaning companies, among others.

88.     JWD made unauthorized purchases of items from gas stations including cigarettes and miscellaneous groceries, used Plaintiff's funds to have a lock installed at his personal residence and stole funeral records belonging to Plaintiff, among other things.

89.     JWD's actions have resulted in Plaintiff being deprived of certain of its assets.

90.     As a result, Plaintiff has suffered damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant Jeffrey W. Dean, including damages, interest, attorney's fees and costs, and grant all other relief deemed necessary and just.

By: _____
JASON M. MURRAY
Florida Bar No. 912336
E-Mail: jmurray@carltonfields.com
LATASHA A. GETHERS
Florida Bar No. 0115886
E-Mail: lgethers@carltonfields.com
CARLTON FIELDS, P.A.
4000 International Place
100 S.E. Second Street
Miami, Florida 33131
Telephone: (305) 530-0050
Dated: November 21, 2002          Facsimile:  (305) 530-0055

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second St. - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2213453.02                    15

EXHIBIT "A"

THIS MORE FORMAL ASSET PURCHASE AGREEMENT
is made as of the __1st__ day of __June_____, 1992.

BETWEEN:

DEAN-LOPEZ FUNERAL HOME, INC., a body
corporate duly incorporated and existing under
the laws of the State of Florida, and having a
place of business at 200 North Federal Hwy,
Pompano Beach, Florida, 33062,

("BUYER")

OF THE FIRST PART

AND:

FLORIDA FUNERAL SERVICES, INC., a body
corporate duly incorporated and existing under
the laws of the State of Florida, and having
its principal place of business at 418
Simonton Street, Key West, Florida, U.S.A.
33040, J. Robert Dean and Donna Dean, both of
Key West, Florida

(collectively, the "SELLER")

OF THE SECOND PART

AND:

J. ROBERT DEAN ("JRD") and DONNA DEAN, both of
Key West, Florida

(together, "PRINCIPAL")

OF THE THIRD PART

WHEREAS:

A.      Seller is the owner and operator of two funeral home
businesses known as "Dean-Lopez Funeral Home" and "Pritchard



EXHIBIT

"A"

- 2 -

Funeral Home" ("PRITCHARD"), respectively, both of which are located in Key West, Florida (together, the "BUSINESS");

B.        Principal is the registered and beneficial owner of all of the issued and outstanding shares in the capital stock of Seller;

C.        The parties entered into a letter agreement made as of March 23, 1992 (the "INITIAL AGREEMENT") attached as Schedule A to this Agreement pursuant to which Seller and Principal agreed to sell to Buyer and Buyer agreed to purchase from Seller and Principal substantially all the property and operating assets of the Business;

D.        The parties are entering into this Agreement in accordance with the terms and conditions of the Initial Agreement and agree that in the event of any conflict between the terms of the Initial Agreement and this Agreement, this Agreement will prevail.

        IN CONSIDERATION of the mutual covenants, agreements, representations, and warranties contained in this Agreement the parties agree as follows:

1.        **PURCHASE AND SALE**

        On the terms and subject to the conditions of this Agreement, Seller and Principal agree to sell, convey, transfer, assign and deliver to Buyer and Buyer agrees to purchase from Seller and Principal all the assets of Seller and of the Business as more particularly described in Article 2 of this Agreement, whether tangible, intangible, real, personal, or mixed, and wherever located (the "ASSETS"), save and except the real property located at 828 White Street, Key West, Florida and used in the operation of the business of Pritchard (such real property particularly described in Schedule B.1 hereto and hereinafter called the "PRITCHARD PROPERTY") and all cash and cash equivalents not otherwise associated with pre-need funeral arrangements, free and clear of all mortgages, liens, leases, pledges, charges, encumbrances, equities, easements, rights of way, covenants, conditions, restrictions or claims of every nature and kind whatsoever, with the exception of those approved by Buyer in writing, for the total price of $1,225,000 in lawful money of the United States (the "PURCHASE PRICE"). The Purchase Price will, subject to adjustments, be paid to Seller as follows:

- 3 -

(a)   $725,000, by check or wire transfer on June 1, 1992, on transfer of good and valid title to the Assets to Buyer in accordance with this Agreement, or such other date as the parties or their attorneys agree in writing; provided however that Buyer shall have the right to extend the said date of such payment by up to 30 days, if necessary, to allow completion of environmental, title and appraisal review (the "CLOSING DATE"); and

(b)   $500,000, to be secured by a promissory note to be issued by Buyer to Seller on the Closing Date and to earn interest at an annual rate of 9%, such principal amount to be payable in equal monthly blended payments together with the interest earned thereon during the fifteen year period such payments to commence on the first anniversary of the Closing Date and to be payable on such date in each month thereafter for the 179 months immediately following.

2.        DESCRIPTION OF ASSETS

The Assets include, without limitation, the following:

(a)   save and except the Pritchard Property, all real property used in the Business, including all parking, crematory and other facilities including, without limitation, the real property more particularly described in Schedule B.2 to this Agreement, together with the buildings, improvements and fixtures located on such real property (the "LAND" and the "BUILDING", collectively the "PROPERTY");

(b)   all motor vehicles used in the Business including, without limitation, those more particularly described in Schedule C to this Agreement, which lists the vehicle identification numbers, license numbers, mileage, make, year and model of all such vehicles (the "AUTOMOBILES");

(c)   all equipment, furniture and furnishings used in and comprising the Business including, without limitation, the items described in Schedule D to this Agreement (the "EQUIPMENT");

(d)   all casket inventory and supplies (the "INVENTORY") existing on the Closing Date, the casket inventory comprised in the Inventory to be of a value of ~~13,550~~ 15,991, valued at the cost to Seller as established by invoice. A list of the Inventory, including the casket inventory,

- 4 -

each casket's selling price, invoice cost, date and
amount of the latest price increase, will be attached as
Schedule E to this Agreement on the Closing Date.  Any
difference between 13,550 and the actual value of the
casket inventory on the Closing Date will be accounted
for as an adjustment on the Purchase Price in favor of
the appropriate party on the Closing Date;

(e)   the benefit of all contracts, engagements or commitments,
whether written or oral, to which Seller or Principal is
entitled in connection with the Business including,
without limitation, all right, title and interest of
Seller and Principal to and under any prearranged funeral
or cemetery insurance policy, plan, deposit and agreement
held in trust by Seller or Principal (the "FUNERAL
CONTRACTS").  A list of all such prearranged insurance
policies, plans, deposits and other similar agreements,
together with a list and copies of all other material
contracts and commitments of Seller and Principal
affecting the Business or the Assets will be attached as
Schedule F to this Agreement on the Closing Date and
updated as of that date (collectively, the "MATERIAL
CONTRACTS");

(f)   all accounts receivable (the "RECEIVABLES") outstanding
as of the Closing Date, a list of the Receivables
indicating appropriate aging to be attached as Schedule
G to this Agreement which shall indicate appropriate
aging of the Receivables.  Any shortage in the actual
principal value of the Receivables and $10,000 on the
Closing Date will be accounted for as an adjustment to
the Purchase Price in favor of Buyer;

(g)   the goodwill of the Business together with the exclusive
right to Buyer to represent itself as carrying on the
Business in continuation of and in succession to Seller,
the right to all operating and trade names associated
with the Business, or any variations of such names, as
part of or in connection with the Business, all telephone
listings, telephone numbers and telephone advertising
contracts, all lists of customers, books and records and
other information relating to the day to day carrying on
of the Business, all necessary licenses and
authorizations and any other rights used in connection
with the Business (the "GOODWILL").

All schedules referred to in this Agreement will be completed,
and copies delivered to Buyer as soon as possible after the

- 5 -

signing of this Agreement, with the exception of those
schedules which are to be attached on the Closing Date. The
obligation of Buyer to consummate the transactions referred to
herein is expressly subject to and conditioned on the delivery
of all such Schedules in completed form, and the approval and
satisfaction of Buyer with respect to the matters disclosed
thereon.

3.      **CLOSING DATE ADJUSTMENTS**

All adjustments will be calculated and Seller and Principal
will deliver up possession of the Assets to Buyer at 12:01
a.m. on the Closing Date. Any adjustments determinable on the
Closing Date will be adjusted against that portion of the
Purchase Price payable on the Closing Date. Any funerals not
fully completed and conducted as of 12:01 a.m. on the Closing
Date will be for the benefit of Buyer.

4.      **ALLOCATION OF PURCHASE PRICE**

The Purchase Price will be allocated in the manner set out in
Schedule H, and the parties agree to report this transaction
for federal tax purposes in accordance with such allocation.

5.      **REPRESENTATIONS AND WARRANTIES OF SELLER AND PRINCIPAL**

Seller and Principal jointly and severally warrant and
represent to Buyer as follows, and acknowledge and confirm
that Buyer is relying upon such warranties and representations
in connection with the purchase of the Assets:

(a)     <u>Status of Seller</u>.   Seller is a corporation duly
        organized, validly existing and in good standing under
        the laws of the State of Florida, and has all necessary
        powers to own and dispose of its assets and to carry on
        the Business as now owned and operated, and neither the
        ownership of the Assets nor the nature of the Business
        requires Seller to be qualified in any jurisdiction other
        than the State of Florida.

(b)     <u>Assets</u>.   Seller owns and possesses and has good and
        marketable title to the Assets. The assets listed in the
        Schedules to this Agreement include all the assets of
        Seller and all of the assets used in the Business, except
        cash which is expressly excluded pursuant to this
        Agreement. Save and except for those matters noted in
        the building inspection report to be conducted by a
        certified building engineer prior to the Closing Date and

- 6 -

certain repairs to be made at Seller's expense to the roof of the Building prior to the Closing Date, to the best of Seller's knowledge, the Property and the Assets are in good operating condition and repair and in sound structural condition, ordinary wear and tear excepted, free and clear of any material defects. The Property and the Assets are free and clear of any restrictions on or conditions to their transfer or assignment. Without limiting the generality of the foregoing, to the best of Seller's knowledge, the Property and all building and improvements affixed thereto, including, without limitation, roofs, foundations, walls and all included electrical, plumbing, air-conditioning, heating, refrigeration and similar units and systems, are sound and in good working order and in a state of reasonable upkeep, maintenance and repair, ordinary wear and tear from reasonable use thereof alone excepted. Seller holds, and will hold as of the Closing Date, good and valid title to the Assets and, on the Closing Date, will be in the position to transfer the Assets to Buyer free and clear of all mortgages, liens, leases (other than leases being assigned pursuant to this Agreement), pledges, charges, encumbrances, equities, easements, rights of way, covenants, conditions, restrictions or claims of every nature and kind whatsoever, other than those approved by Buyer in writing. There has been no material change in the condition of any of the Assets since each item was inspected by a representative of Buyer. In the event that any remediation is required pursuant to the said inspection, Seller and Buyer will then determine responsibility for the cost of such remediation.

(c) <u>Legal Requirements</u>. Seller has the power to own the Assets and to carry on the Business, is duly licensed, registered and qualified to carry on business in the State of Florida, and holds all required licenses and permits for carrying on all aspects of the Business as it is now conducted. Seller has complied, and will continue to the Closing Date to comply, with all applicable federal, state or local statutes, laws and regulations and orders applicable to the Business including, without limitation, any applicable building, zoning, or other law, ordinance or regulation affecting the Assets or the operation of the Business.

Seller and Principal have the right, power, legal capacity, and authority to enter into, and perform their

respective obligations under, this Agreement, and no approvals or consents of any other persons or entities are necessary. The execution, delivery and performance of this Agreement by Seller has been duly authorized by its shareholders and board of directors. Seller is not in default under any charter agreement, indenture, mortgage, lease, deed of trust, note or other instrument to which it is subject or by which it, the Business, the Assets or Principal are, or may be, bound. The execution and delivery of this Agreement by Seller and Principal will not constitute a default or an event that, with notice or lapse of time or both, would be a default, breach, or violation of any lease, licence, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, or other agreement, instrument or arrangement to which any of Seller and Principal is a party of by which any of them or the Assets is bound.

(d)  <u>Ordinary Course of Business</u>.  From the date of the Initial Agreement to the Closing Date, the Business has been and will be carried on in the ordinary course and Seller will not enter into any material agreements or commitments other than in the ordinary course of business.  There has been no material adverse change in the financial condition, assets, business or prospects of Seller.

(e)  <u>Environmental Issues</u>.  Except as otherwise disclosed by the Level I Environmental Audit to be conducted pursuant to the terms of this Agreement, during the period of Seller's ownership or control of the Property and the Pritchard Property and to the best of Seller's and Principal's knowledge at all other times prior to the Closing Date:

   (i)  there have been no underground storage tanks nor have there been any hazardous or toxic materials, substances, pollutants, contaminants or wastes present in the soil, subsoil, or groundwater of or on the Property or the Pritchard Property, and none of the above have been deposited, discharged, placed or disposed of at, on or near the Property or the Pritchard Property;

   (ii)  there has been no asbestos, ureaformaldehyde, lead paint or, to the best of the knowledge of Seller and Principal, any termites or similar destructive insects, or "PCBs" present in the improvements on

- 8 -

the Property or the Pritchard Property, nor has there been any substance containing any such materials present in the improvements on the Property or the Pritchard Property in contravention of any applicable federal, state or local laws, rules or regulations; and

(iii)  the Assets have not been affected in any way by any substance deemed hazardous by federal, state or local laws, rules or regulations.

Buyer will, at equal cost to Principal and Buyer and in a form satisfactory to Buyer, procure a Level I Environmental Audit produced by a qualified engineer, approved by Buyer, testing for the items described in the preceding paragraph.   In the event that Buyer or any appropriate authority, governmental or otherwise, with legal jurisdiction over such matters, requires further testing on or in respect of the Property for such items described herein, the cost of such testing will be borne equally by Buyer and Principal.   Where such testing results in any type of recommendation, order or other requirement for the removal from the Property or the Pritchard Property of any underground tanks or of any hazardous or toxic substance, or for the installation of any monitoring equipment, the cost of such removal or installation (the "CLEAN UP COST") will be borne by Seller.  In the event that the Clean Up Cost is estimated to exceed $20,000, Seller and Principal will notify Buyer in writing as to whether or not Seller and Principal will fund the total amount of the Clean Up Cost.  In the event Seller and Principal do not elect to pay such cost, this Agreement will immediately become null and void and any monies paid by Buyer to Seller or Principal or on Seller's behalf will be immediately returned to Buyer unless Buyer agrees to pay the amount of the Clean Up Cost in excess of $20,000, in which case this Agreement will continue in full force and effect, Seller will pay $20,000 of the Clean Up Cost and Buyer will pay the remainder of the Clean Up Cost, whether such clean up is undertaken before or after the Closing Date.

Notwithstanding the foregoing obligation of Seller, if the Clean Up Cost is in excess of $10,000, Buyer agrees to increase the annual non compete payments made to JRD, as referenced in paragraph 7(p), such increase to be made pursuant to the formula more particularly described in paragraph 7(p) hereto.

- 9 -

(f)  <u>Florida Resident</u>.  Seller and Principal are residents of
     the State of Florida within the meaning of all applicable
     income tax laws.

(g)  <u>Funeral Contracts</u>.    All monies paid to Seller and
     Principal as of the Closing Date in respect of Funeral
     Contracts have been set aside and identified as set out
     in Schedule F.  Seller and Principal have complied with
     the terms and conditions of the Funeral Contracts and are
     not aware of any defaults by Seller or any other party to
     the Funeral Contracts.

     The funds (including interest), held in trust in respect
     of each of the Funeral Contracts (collectively, the
     "FUNDS") are held in conformity with the laws and
     regulations of the State of Florida and will be so held
     on the Closing Date with respect to all of the Funeral
     Contracts in effect at that time.  All withdrawals from
     the Funds have been, and will up to the Closing Date be,
     made in accordance with all applicable local, state and
     federal laws, regulations and ordinances, and Seller will
     have paid on the Closing Date all commissions collected
     on behalf of commissioned sales people in respect of the
     Funeral Contracts.

     For those Funeral Contracts that are funded by insurance,
     Seller and Principal have purchased all such insurance
     policies required to fully fund all such Funeral
     Contracts, and no future premiums remain to be paid,
     except in respect of policies providing for payment on a
     time basis.  All such insurance policies, and the Funeral
     Contracts that were purchased to fund such insurance, are
     fully identified on Schedule F. ·

     Seller, as fiduciary, or through its trustee, has the
     Funds on hand by way of deposits to interest bearing
     trust accounts or other investments that are eligible
     under all applicable legislation.

(h)  <u>Litigation</u>.  Except as disclosed in Schedule L to this
     Agreement, there is no claim, suit, action, arbitration,
     governmental inquiry, injunction, consent decree or
     legal, administrative or other proceeding existing,
     pending, or threatened against or relating to Seller, or
     to Seller's financial condition, or to the Business, or
     any of the Assets, nor does Seller or Principal know of
     or have reasonable grounds for believing that there is

- 10 -

any basis for any such action, arbitration, proceeding or inquiry.

(i)   <u>Financial Statements</u>.    The financial statements of Seller attached as Schedule I are true and correct in every material respect, have been prepared in accordance with accrual accounting methods consistently followed by Seller throughout the periods indicated, and present fairly the financial position of Seller as of the respective dates of the balance sheets included in the financial statements and the results of its operations for the respective periods indicated. All financial and other information provided by Seller and Principal to Buyer and its representatives to date is true and correct in every material respect and no extraordinary events of any nature have in any way affected such information or the Business.   There are no additional sets of books, duplicate sets, "second sets" or other documents or records of the Business kept by Seller which purport to show the financial status of the Business and that have not been delivered to or inspected by Buyer.

(j)   <u>Taxes and Unemployment Compensation</u>.   As of the Closing Date, Seller and Principal will have paid when due all special charges or levies, taxes, unemployment compensation contributions, penalties and interest that could form a charge or encumbrance on the Assets or that could become payable by Buyer as a result of or in connection with any event that occurs before the Closing Date. Without limiting the generality of the foregoing, all federal, state, county and local taxes that could form a charge or encumbrance on the Assets, including, without limitation, income, corporate franchise, stamp, transfer, sales and use, employee withholding and ad valorem taxes due and payable by Seller and Principal on or before the date hereof and on or before the Closing Date have been or will have been paid or provided for, and Seller and Principal have, and will as of the Closing Date have, filed all taxes and reports required to be filed as of such date by Seller or Principal pursuant to the operation of the Business with all such taxing authorities.    Additionally, Seller and Principal will make all of its necessary tax filings in a timely manner and in the ordinary course of business after the Closing Date. The provisions for taxes included in the financial statements represents adequate provision for the payment of all accrued and unpaid taxes of Seller whether or not disputed.     Neither Seller nor Principal has any

- 11 -

outstanding or unsatisfied deficiency assessments with respect to any taxes, and there are no current audits or investigations by or disputes with any authority with respect to any taxes.

(k) <u>All Accounts Paid</u>.  All account billings which have been received by Seller or Principal for work, labor and materials in connection with any building, repairing or renovating undertaken by Seller upon any of the Assets or with respect to any other expense incurred in connection with the Business will be fully paid on or before the Closing Date or, failing such payment, Seller will pay such accounts in a timely manner and in the ordinary course of business after the Closing Date.  All such accounts which are received by Seller and Principal after the Closing Date for goods delivered before the Closing Date or for services performed before or in respect of a period before the Closing Date will be paid by them when received.

(1) <u>Contractual Arrangements and Employee Relations</u>.

    (i)    Seller is and will be as of the Closing Date in compliance with all federal, state and local laws, ordinances and regulations respecting employment practices, terms and conditions of employment and wages and hours and is not and has not engaged in any unfair labor practice.  There is no unfair practice complaint against Seller pending before the National Labor Relations Board.  As of the Closing Date, Seller will not have any contracts, agreements, pension plans, profit sharing plans, bonus plans, undertakings or arrangements, whether oral, written or implied with lessees, licensees, employees, managers, accountants, suppliers, agents, officers, distributors, directors, lawyers, or others which cannot be terminated on one month's notice other than those listed in Schedule F.

    (ii)    The attached Schedule J contains a list of all employees of Seller, their wages and other remuneration of every kind, including current year vacation pay earned to date, and the date and amount of the latest wage increase of each such employee.

    (iii)    There are no profit sharing or similar plans, or other deferred compensation plans affecting the

- 12 -

Business and Seller is not party to any collective agreement with any labor union or other association of employees and, to the best of the knowledge of Seller and Principal, no attempt has been made to organize or certify the employees of Seller as a bargaining unit.

(iv) To the knowledge of Seller and Principal, Seller has never been the subject of any inspection or investigation relating to its compliance with or violation of the Immigration Reform and Control Act of 1986, or any related federal statute and the rules and regulations promulgated thereunder (the "Immigration Laws"), nor has it been fined or otherwise penalized by reason of any failure to comply with the Immigration Laws, nor, to the knowledge of Seller or Principal, is any such proceeding pending or threatened.

(v) Seller and Principal have complied with all requirements of the Employee Retirement Income Security Act of 1974, as amended.

(m) <u>Full Disclosure</u>.   None of the representations and warranties made by Seller and Principal, or made in any certificate, memorandum or document furnished or to be furnished by any of them, or on their behalf, contains or will contain any untrue statement of a material fact, or omits or will omit any material fact the omission of which would be misleading.

(n) <u>OSHA, ADA and FTC</u>.   Except as disclosed in the OSHA Questionnaire and the ADA Questionnaire completed by Seller in connection with the transaction contemplated by this Agreement attached hereto as Schedule M, Seller is in compliance with all applicable requirements of the Occupational Safety and Health Act ("OSHA") and the Americans with Disabilities Act ("ADA") pertaining to the facilities and operations used in the Business, and Seller is also in compliance with all requirements of the Federal Trade Commission's Funeral Industry Practices Regulation ("FTC FUNERAL RULE").

6.    **BULK SALES**

Seller and Principal hereby represent and warrant that at the time of the Closing Date the fair market value of the Assets, or the value thereof on the books of Seller, whichever is the

- 13 -

lesser amount, will exceed the total amount of Seller's liabilities, and that the proceeds to Seller from the sale of the Assets contemplated by this Agreement will be applied first to the debts of Seller associated with and related to such Assets.   In consideration of such representation and warranty by Seller, Buyer hereby waives any compliance with the Bulk Sales Act of any State or other jurisdiction which might be applicable to the transactions contemplated by this Agreement subject to the agreement that nothing in this Section shall estop or prevent Buyer from asserting as a bar or defence to any action a proceeding brought under the law that it is not applicable to the sale contemplated by this Agreement; provided however, that Seller and Principal will indemnify and hold harmless Buyer from and against any and all claims, loss, liability or expense (including reasonable attorney fees) which may arise as a result of the application of any such Bulk Sales law, the intent of this provision being that Seller and Principal will maintain:

    (a)   Buyer in such financial condition as would have resulted had such compliance taken place; and

    (b)   the title of Buyer to the Assets in such condition as would have resulted had such compliance taken place.

7.      **COVENANTS OF SELLER AND PRINCIPAL**

    (a)   <u>Procure Consents</u>.   Seller and Principal will diligently take all reasonable steps required to obtain, prior to the Closing Date, all consents to the assignment, transfer, conveyance or other disposition of the Assets to Buyer where such a consent is required.

    (b)   <u>Sales and Use Tax</u>.   Seller agrees to furnish Buyer as soon as possible following the Closing Date with any certificates that Buyer may reasonably request, as evidence that all sales and use tax liabilities of Seller accruing before the Closing Date have been fully satisfied or provided for.

    (c)   <u>Licenses</u>.   Seller will take all necessary steps to effect the transfer of its funeral establishment license to Buyer.  Buyer recognizes that obtaining such transfer might not occur until after the Closing Date, and the closing of this transaction will not be delayed because of Seller's failure to obtain such license transfer. Notwithstanding the closing of this transaction, Seller

- 14 -

will fully cooperate with Buyer to expedite such license transfer.

(d)  Insurance.   Seller and Principal will up to and including the Closing Date maintain in full force and effect the existing policies of insurance of the Assets. The Business will remain at the risk of Seller to the Closing Date. In the event of loss, Buyer may have the proceeds of insurance and complete the purchase of the Assets, or may cancel this Agreement and any monies paid to Seller or Principal will be returned to Buyer. Seller and Principal will terminate coverage of their insurance policies in respect of the Assets as of 12:01 a.m. of the day following the Closing Date.

(e)  Goodwill.   Seller and Principal agree to use their best efforts to protect the ongoing goodwill of the Business both before and after the Closing Date and to ensure that key employees and key independent contractors continue their association with Seller up to and including the Closing Date.

(f)  Nominee Company.   Seller and Principal will fully cooperate with Dean Lopez Funeral Home, Inc. to allow it to incorporate a subsidiary corporation called "FFS, Inc." or a variation thereof to be its nominee under the terms of this Agreement, and agree to provide prior to the Closing Date all necessary consents for such incorporation. Further, Seller and Principal agree to change the corporate name of Seller to a name acceptable to Buyer immediately following the Closing Date and Seller and Principal acknowledge that Buyer will change the name of its nominee company contemporaneously with such change to either "Dean Lopez Funeral Home, Inc." or "Florida Funeral Service, Inc." or a variation of either such name as Buyer in its sole discretion may choose.

(g)  Access to Information.   Seller and Principal will ensure that Buyer and its attorneys, accountants and other representatives have access during regular business hours to all properties, books, accounts, records, contracts and documents of or relating to the Business. Seller and Principal agree to furnish to Buyer and its representatives all data and information concerning the Assets or the Business that may be reasonably requested by any of them.

- 15 -

(h)  **Further Assurances**.  After the Closing Date, Seller and Principal will execute all documents and do all such further deeds, acts, things and assurances that may be requisite in the opinion of counsel for Buyer for more perfectly and absolutely assigning, transferring, assuring to and vesting in Buyer title to the Assets, free and clear of all mortgages, liens, charges, pledges, security interests, encumbrances, equities or other claims of every nature and kind whatsoever and for carrying out the intention of or facilitating the performance of the terms of this Agreement.

(i)  **Conduct of Business Pending Closing**.   Seller and Principal have, since the date of execution of the Initial Agreement, and will until the Closing Date:

   (i)   conduct the Business only in the ordinary course;

   (ii)  make no increase in the compensation payable or agreements with any employee or agent by which Buyer is bound;

   (iii) not make any commitment on behalf of Buyer, by which Buyer is bound to any third party, except in the ordinary course of the routine affairs of the Business;

   (iv)  use their best efforts to keep the business organization of Seller intact, and to keep available to Buyer the services of the present employees, and to preserve for Buyer the goodwill of the Business, its suppliers, customers and dealers, and others with which Seller has business relations; and

   (v)   make no announcement or disclosure of the prospective purchase and sale contemplated by this Agreement without consultation and coordination of such announcement with Buyer.  All parties will use their best efforts to attain a favorable public relations posture and response in the community, and to retain the goodwill of the Business pending, during and after the Closing Date.

(j)  **Employees**.  As of the Closing Date Seller will terminate the employment of all of its employees and, with the exception of vacation pay owing to employees who will be starting work with Buyer, will pay all accrued benefits

- 16 -

      for all employees including, but not limited to, severance, sick leave, medical benefits and pension contributions. The amount of any accrued vacation pay owing to employees who commence work with Buyer will constitute a reduction to the Purchase Price and all such employees will have the option to receive all accrued vacation pay owing to them or to take their vacation in the ordinary course. Seller and Principal acknowledge that Buyer will have no obligation to pay to any employees of Seller any amount or provide any benefit to any such employees except as provided in this Agreement.

(k) <u>Legal Opinion</u>.  Seller will provide to Buyer an opinion from its attorneys dated the Closing Date substantially in the form of Schedule K.

(1) <u>Legal Matters</u>.  Seller and Principal will be fully responsible for and will indemnify Buyer and hold Buyer harmless against any and all losses, damages, expenses, liabilities, claims or demands, including attorneys' fees, whatsoever suffered or incurred by Buyer as a result of any litigation or threatened litigation arising from matters that occur on or before the Closing Date.

(m) <u>Funeral Contracts and Trust Funds</u>.  Seller and Principal agree that, upon receipt of written notice from Buyer, Seller will reimburse Buyer for the cost of fulfilling all Funeral Contracts involving Seller, whether funded by insurance or trust funds, that are not fully identified in Schedule F or properly funded. Seller and Principal further agree that, upon receipt of written notice from Buyer, Seller will pay to Buyer, and indemnify Buyer for, the amount of any shortfall in the Funds as defined in paragraph 5(h). "Shortfall" will mean the difference as of the Closing Date between all amounts legally or contractually required to be paid for insurance policies or placed in trust and the amounts actually paid for insurance policies or placed in trust. Neither Seller nor Principal will withdraw any monies from the Funds before the Closing Date other than in accordance with the terms of the Funeral Contracts. Seller at the Closing Date will assign the accounts, if any, to Buyer and will execute all necessary documentation as Buyer may require with respect to such assignment. In the event it is necessary to notify the beneficiaries of the Funeral Contracts respecting this purchase and sale, Buyer will make all arrangements respecting the delivery and content of the notices.

- 17 -

(n) <u>Taxes and Unemployment Compensation</u>.    Seller and Principal will be responsible for and will indemnify Buyer and hold Buyer harmless against any and all losses, damages, expenses, liabilities, claims or demands, including attorney's fees, suffered or incurred by Buyer on account of any and all special charges or levies, taxes, unemployment compensation contributions, penalties and interest that form a charge or encumbrance on the Assets or that become payable by Buyer as a result of or in connection with any event that occurs before the Closing Date.

(o) <u>Account Billings</u>.    Seller and Principal will indemnify and hold Buyer harmless for any and all losses, damages, expenses, liabilities, claims or demands suffered or incurred by Buyer, including attorneys' fees, caused by or arising out of the failure of Seller and Principal to pay any account payable, tax, note or obligation incurred in the operation of the Business or in respect of a period prior to the Closing Date.

(p) <u>Title Matters</u>.    Prior to the Closing Date, Buyer will obtain the following in a form satisfactory to Buyer:

   (i)   an ALTA survey, or its Florida equivalent, of the Property, the cost of which will be borne equally by Seller and Buyer;

   (ii)  an ALTA Extended Owner's and Leasehold Form B Policy of Title Insurance, or its Florida equivalent, relating to the Property and the Pritchard Property, respectively, the cost of which will be borne by Seller;    ,

   (iii) an appraisal of the Property, the cost of which will be borne equally by Seller and Buyer; and

   (iv)  a report from a qualified building inspector approved by Buyer certifying that the condition of the Property and the Pritchard Property, and the improvements thereon is as is represented herein, the cost of which will be borne equally by Buyer and Seller.

(q) <u>OSHA, ADA and FTC</u>.  In the event that Seller is not, in the judgment of Buyer, in compliance with OSHA, ADA or FTC, Buyer will, at Seller's expense (provided, however, that Seller's financial responsibility for OSHA related

- 18 -

matters shall be limited to $2,500), bring Seller into compliance with such requirements.

(r)  <u>Non Compete Agreements</u>.  By separate agreements executed prior to Closing, Seller and each Principal will, and will cause Jeffery W. Dean ("JEFFERY"), Jerry C. Dean ("JERRY") and Jimmy Dean ("JIMMY") to, each grant to Buyer a covenant not to compete directly or indirectly with Buyer within Monroe County, Florida, for that period of time which is the later of ten years from the Closing Date or three years from the termination of any employment relationship created between either Principal, Jeffery, Jerry or Jimmy and Buyer in consideration for the following payments:

  (i)  to JRD or, in the event of his death, to JRD's estate:  six consecutive equal annual payments, each of $28,800, without interest, payable monthly in equal installments of $2,400 each, such payments to commence on the first day of the first month immediately following the Closing Date and to be payable on such day in each successive month thereafter;

  (ii)  to each of Jeffery, Jerry and Jimmy:  a one-time only payment of $5,000 each, payable at Closing.

In addition, pursuant to paragraph 5(f) herein, Buyer agrees to increase JRD's consideration as follows if the Clean Up Costs exceed $10,000:

  (i)  in the event Clean Up Costs exceed $10,000 but are less than $15,000, Buyer will increase JRD's annual payments as described above by $1,000 each;

  (ii)  in the event Clean Up Costs exceed $15,000 but are less than $18,000, Buyer will increase JRD's annual payments as described above by $1,500 each;

  (iii)  in the event Clean Up Costs exceed $18,000, Buyer will increase JRD's annual payments as described above by $2,000 each.

(s)  <u>Consulting Agreement</u>.  By separate agreement executed prior to Closing, JRD will enter into a consulting agreement with Buyer, such agreement providing for a term of six years, an annual fee of $1,200 and the right of JRD to schedule any work at his discretion. *as set forth in such consulting agreement*

- 19 -

(t)   <u>Lease of Pritchard Property</u>.   By separate agreement, Principal will enter into a triple net lease agreement ("LEASE") whereby Buyer agrees to rent from Principal and Principal agrees to let to Buyer the Pritchard Property. The Lease will be for a term of one year with annual rent of $10,000 payable at Closing, such term to be renewable annually thereafter at a monthly rent of $1,000.   The Lease will, without limitation, include the following terms:

    (i)   a right of first refusal in favor of Buyer to Purchase the Pritchard Property,

    (ii)   a restrictive covenant to be recorded on the Closing Date ensuring that the Pritchard Property will not be used as a funeral home business for the fifteen year period immediately following the date of termination of the Lease, and

    (iii)   a right to record a memorandum of the Lease which shall set forth the right of first refusal.

(u)   <u>Certificate of Authority</u>.   Seller will surrender its Certificate of Authority to the Florida Department of Insurance on the Closing Date by delivering such certificate to Buyer with instruction for such surrender.

8.   **PROPERTY TRANSFER**

The transaction contemplated by this Agreement will be effective upon completion of the following:

(a)   <u>Transfer of The Property</u>:

    (i)   <u>Conveyance</u>.   At Closing, Seller will convey to Buyer title in fee simple to the Property as provided in this Agreement.   Conveyance will be by a special warranty deed, substantially in the form of Schedule N attached hereto (the "DEED").

    (ii)   <u>Preliminary Title Report</u>.   Buyer will obtain, at Seller's expense, a preliminary title report for an owner's and leasehold form of title insurance for the Property for Pritchard Property, respectively, as soon as same is available, along with copies of all exceptions to title.   Such report will be in sufficient detail to provide the basis for the issuance of an ALTA Extended Owner's Form B Policy

- 20 -

of Title Insurance in respect of the Property and an ALTA Leasehold Policy of Title Insurance for Pritchard Property, or their Florida equivalents (the "POLICY").  Buyer will within five days of receipt of such reports indicate to Seller all exceptions ("PERMITTED EXCEPTIONS") that may remain on title for the Property.

(iii)   <u>Title Policy</u>.   Prior to disbursement to Seller of the portion of the Purchase Price remaining payable on the Closing Date after all exceptions are removed from title to the Property as required by Buyer, Seller will either deliver to Buyer the said policies or binding undertakings to issue such policies in the full amount of the Purchase Price allocated to the Property and in a nominal amount in respect of the Pritchard Property.  The Owner's Policy will contain no exceptions other than the Permitted Exceptions including, without limitation, the standard exceptions.

The transaction of purchase and sale contemplated by this Agreement will not close and no funds will be disbursed to Seller until the Policy can be issued containing no exceptions other than the Permitted Exceptions.

(b)   <u>Transfer of all Assets other than real property</u>.  Prior to disbursement to Seller of any portion of the Purchase Price, Seller will deliver to Buyer an appropriate bill of sale (the "BILL OF SALE") evidencing the transfer of good and marketable title to all Assets other than real property free and clear of all mortgages, liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions or claims of every nature and kind whatsoever.

(c)   <u>Prorations</u>.  City and county real estate property taxes, interest on assessments and rental payments, if any, covering the Property will be prorated between Buyer and Seller.

(d)   <u>Closing of Transaction</u>.  Transfer of good and marketable title to the Assets, subject only to the Permitted Exceptions, is a condition precedent to the closing of this transaction.  After all conditions precedent required to be satisfied by the terms of this Agreement have been satisfied, Seller will:

- 21 -

(i)   record the Deed and any other documents or instruments which are necessary to transfer the Assets;

(ii)  deliver proof of recording the Deed, a binding commitment to deliver to Buyer the Policy, the Bill of Sale and all other documents necessary to satisfy Buyer's attorneys that the Assets have been properly transferred to and registered in the name of Buyer.

After deducting all items chargeable to the account of Seller and all amounts necessary to remove all but the Permitted Exceptions, the balance of the funds will be disbursed to Seller in accordance with the provisions of Article 1 above.

9.      **SURVIVAL OF REPRESENTATIONS**

The representations, warranties, covenants and agreements by Seller and Principal in this Agreement and its schedules, or documents delivered pursuant to the provisions of this Agreement or in connection with the transactions contemplated by it will be true at and as of the Closing Date. Notwithstanding any investigations or enquiries made by Buyer prior to the Closing Date or the waiver of any conditions by Buyer, the representations, warranties, covenants and agreements of Seller and Principal will survive the Closing Date and, notwithstanding the closing of the purchase and sale provided for in this Agreement, will continue in full force and effect for the three year period immediately following the Closing Date, save and except that all representations, warranties, covenants and agreements of Seller and Principal relating to the Funeral Contracts, environmental matters and taxes shall not be limited to such three year period but will thereafter continue in full force and effect.

10.     **INDEMNITY**

Seller and Principal agree with Buyer to reimburse or to indemnify and save Buyer harmless from and against any and all losses, damages, expenses, liabilities, claims or demands whatsoever suffered or incurred by Buyer (including, but not limited to, Buyer's attorneys fees), resulting or arising from:

(a)   any breach of, or misrepresentation in, the representations, warranties and covenants of Seller and

- 22 -

Principal contained in this Agreement and its schedules
or in the documents delivered pursuant to the provisions
of this Agreement or in connection with the transactions
contemplated by this Agreement; or

(b)   any  and  all  liabilities  and  obligations  whatsoever
whether  accrued,  absolute,  contingent  or  otherwise,
relating  to  the  operation  of  the  Business  prior  to  the
Closing Date.

11.      **OFFSET**

To secure the obligations of Seller and Principal pursuant to
this Agreement, Buyer shall have the right to offset or reduce
any  payments  due  Seller  or  Principal  including,  without
limitation, any payments payable pursuant to the agreement not
to compete, the consulting agreement and the lease agreement
to be entered into contemporaneously with this Agreement and
more particularly described herein.  Such offset or reduction
shall  not  constitute  a  breach  or  default  under  such
agreement(s) or this Agreement.  If Seller becomes obligated
to reimburse or indemnify Buyer pursuant to Article 10 hereof,
and fails to promptly do so, Buyer may reduce the amount of or
completely stop making payments to Seller or Principal until
the  amount  of  such  reimbursement  due  is  recovered  by  Buyer,
provided that Buyer has given Seller or Principal at least 30
days written notice prior to taking such action.  If Buyer has
reasonable grounds to believe that it may suffer or incur any
loss, damage, expense, liability, claim or demand for which it
is indemnified by Seller or Principal, then it may withhold
payments due Seller or Principal, as provided above, and
deposit such funds with an escrow agent to be selected by it
to be held in accordance with the provisions of this Article,
such funds to be released to Buyer upon occurrence of the
loss, liability, expense or damage.   If the amount withheld
exceeds the amount of the loss, liability, expense or damage
suffered or incurred by Buyer, such excess shall be promptly
paid to Seller.   The rights of Buyer under this Article 11
shall be in addition to whatever other rights and remedies
Buyer may have pursuant to this Agreement, or at law or
equity.

12.      **CONDITIONS PRECEDENT TO CLOSING**

The  completion  of  the  transaction  contemplated  by  this
agreement is subject to:

- 23 -

(a)   Buyer obtaining approval to proceed from its Board of Directors and the Board of Directors of its parent company, Loewen Group International, Inc.;

(b)   satisfactory completion of a due diligence review, by Buyer (including review of the financial statements and the other reports or audits referred to in this Agreement);

(c)   Buyer entering into mutually satisfactory employment agreements with key operating staff, including management agreements with each of Jeffery and Jerry, each manager to receive an annual salary of not less than $50,000 during the initial five year term of their respective agreements and an employment agreement with Jimmy for an annual salary of not less than $20,000 during the initial five year term of such agreement;

(d)   Buyer having received notice of the approval of the Florida Department of Insurance for the transaction contemplated herein;

(e)   Buyer having received from Seller a copy of Seller's most recent audit conducted pursuant to Section 639.15 Florida Statutes and such audit being in all respects acceptable to Buyer; and

(f)   Buyer obtaining evidence, satisfactory to Buyer, that the Property is zoned to permit the existing improvements and the continuation of the Business conducted on the Property as a conforming use.

These provisions or any of them may be removed by Buyer.

13.   **CLOSING DOCUMENTS**

(a)   <u>Delivery of Closing Documents by Seller</u>.   Unless otherwise provided for elsewhere in this Agreement, at least two business days prior to the Closing Date Seller will deliver to Buyer's counsel the following documents in form and substance reasonably satisfactory to counsel for Buyer, duly executed by Seller or Principal as required and, where such documents are capable for registration, in registrable form, inter alia:

(i)   motor vehicle transfer/tax forms transferring the Automobiles comprised in the Assets to Buyer, free and clear of all tenancies, liens, charges and

- 24 -

encumbrances (one for each Automobile).  The sales tax payable in respect of such transfer of title from Seller to Buyer will be the responsibility of, and payable by, Buyer;

(ii)    an assignment of Seller's interest in all service contracts related to the Assets;

(iii)    an assignment to Buyer of Seller's interest as lessee in all leases of equipment comprised in the Assets, if any, and more particularly described in Schedule D;

(iv)    all warranties and assignments of all warranties, to the extent the same are assignable, if any, of all mechanical and electrical machinery, equipment and roofing, and assignments of all guarantees, if any, from all contractors, subcontractors and suppliers with regard to the supply, construction or repair of any of the Assets;

(v)    an assignment to Buyer of the goodwill, undertaking, trade names, logos, licenses comprised in the Assets;

(vi)    an assignment to Buyer of the interest of Seller and Principal, or all of them, of all of their rights, titles and interests in, to and under the Funeral Contracts;

(vii)    an assignment to Buyer of all trust accounts, if any, related to the Funeral Contracts;

(viii)    a certificate indicating the value of the casket inventory comprised in the Assets as at the Closing Date;

(ix)    assignments to Buyer of all covenants not to compete in respect of all former principals of the Business;

(x)    an opinion of Seller's counsel substantially in the form of Schedule K;

(xi)    a certificate of Seller and Principal as to the status of the covenants, warranties and representations set forth in this Agreement on the

- 25 -

        part of Seller and Principal as at the Closing Date; and

  (xii)  all other bills of sale, deeds, transfers, assignments, acts, things and assurances as may be required in the reasonable opinion of the attorneys for Buyer for more perfectly and absolutely assigning, transferring, conveying, assuring to and vesting in Buyer title to the Assets free and clear of all liens, charges and encumbrances of whatever kind.

  (b)  <u>Covenants and Assignments</u>.  All assignments from Seller, as assignor, to Buyer, as assignee, to be delivered on the Closing Date will include, inter alia, the following covenants:

    (i)  a covenant from Buyer to assume all responsibility for any and all covenants and obligations of Seller under the agreement being assigned arising from and after the Closing Date; and,

   (ii)  an indemnity from Seller and Principal to indemnify, defend and save Buyer harmless in respect of all covenants and obligations of Seller and Principal or any of them under the agreement being assigned arising in respect of the period of time prior to the Closing Date.

**14.**     **CLOSING**

  (a)  <u>Time of Closing</u>.  Subject to the terms and conditions of this Agreement, the purchase and sale of the Assets will be completed at a closing (the "CLOSING") to be held at 10:00 a.m. local time, on the Closing Date or at such other time and date as will be agreed upon in writing between the parties or their respective attorneys.

  (b)  <u>Place of Closing</u>.  The Closing will take place at the offices of Mr. David Blattner, c/o Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Attorneys at Law, 200 E. Broward Boulevard, P. O. Box 1900, Fort Lauderdale, FL, 33302, U.S.A., telephone:  (305) 527-2493, fax: (305) 764-4996.

**15.**     **GENERAL**

- 26 -

(a)  <u>Communications</u>.  All communications required to be given
will be in writing and will be deemed to have been
properly given if transmitted by facsimile transmission,
telexed, telegraphed or delivered to the address of the
party directly, and will be deemed to have been received,
if transmitted by facsimile transmission, telex or
telegraph, on the first business day following such
facsimile transmission, telex or telegraph, or if
delivered, upon the date of delivery or transmission.
Such communications will be sent to the following
addresses:

> (Seller)
> J. Robert Dean and Donna Dean
> c/o Florida Funeral Services, Inc.
> 418 Simonton Street
> Key West, Florida
> U.S.A.       33040
> Fax:  _____
>
> (Buyer)
> Loewen Group International, Inc.
> c/o The Loewen Group, Inc.
> 4126 Norland Avenue
> Burnaby, British Columbia
> Canada, V5G 3S8
> Fax:  (604) 299-2854
> Attention:  Mr. Hugh Hornibrook

(b)  <u>Applicable Law</u>.  This Agreement will be deemed to be a
contract made under the laws of the State of Florida and
for all purposes will be governed by and interpreted in
accordance with the laws prevailing in the State of
Florida, without regard to principles of conflict of
laws.

(c)  <u>Counterparts</u>.  This Agreement may be executed in several
counterparts, each of which when so executed will be
deemed to be an original and which will together
constitute the one and the same agreement; and it will
not be necessary in proving this Agreement to produce or
to prove more than one such counterpart.

(d)  <u>Entire Agreement</u>.  The terms and provisions of this
Agreement and its schedules constitute the entire
agreement between the parties and there are no collateral
agreements or representations or warranties other than as
expressly set forth or referred to in this Agreement.

- 27 -

(e)   <u>Enurement</u>.   This Agreement will enure to the benefit of and be binding upon the parties, their heirs, administrators, successors and assigns.

(f)   <u>Time of Essence</u>.     Time is of the essence of this Agreement.

(g)   <u>Severability</u>.     If a court of competent jurisdiction should find any term or provision of this Agreement to be unenforceable and invalid, then such term or provision shall be severed from this Agreement, and the remainder of this Agreement shall continue in full force and effect.

(h)   <u>Attorneys' Fees and Costs</u>.   In the event of any disputes or controversies arising from the Agreement or its interpretation, the party or parties prevailing in a Court of competent jurisdiction, or receiving a settlement payment from the other party or parties, will be entitled to receive reasonable attorneys' fees and costs incurred in connection with same.  Each party will have the right to choose its own counsel in connection with any such matter, with all reasonable attorneys' fees to be reimbursed by the party that does not prevail in the dispute or controversy.

(i)   <u>Confidentiality</u>.   The parties agree that from and after the date of this Agreement, none of the terms and conditions of this Agreement or any other agreement entered into by the parties or their affiliates, will be disclosed to any third party other than attorneys, accountants, Buyer's lender and other professionals advising the parties in connection with the contemplated transaction, without the prior written consent of the other party.   The parties further agree that any information exchanged in connection with the transaction contemplated by this Agreement is proprietary to the disclosing party, and confidential in nature and it will be treated as such by the receiving party unless such information is or becomes a matter of public record.

(j)   <u>Radon Disclosure</u>.  In accordance with the requirements of Florida Statutes, Section 404.056(8), the following notice is hereby given to Buyer:

        "Radon Gas:   radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present

- 28 -

health risks to persons who are exposed to it over time.  Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your County Public Health Unit."

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

BUYER:

DEAN-LOPEZ FUNERAL HOME, INC.

BY: _____
J. ROBERT DEAN, PRESIDENT

SELLER:

FLORIDA FUNERAL SERVICES, INC.

BY: _____
J. ROBERT DEAN, PRESIDENT

_____
J. ROBERT DEAN

_____
DONNA DEAN

SIGNED by Principal              )
in the presence of:              )
                                 )
_____        )
Signature                        )
                                 )          PRINCIPAL:
STEPHEN G. SALLEY                )
Name                             )          _____
                                 )          J. ROBERT DEAN
POB 231 ORLANDO, FLA.            )
Address                          )          _____
                                 )          DONNA DEAN
                                 )
ATTY.                            )
Occupation                       )
(Witness as to both signatures)
dean-lopez\usasset.mfa

- 29 -

## LIST OF SCHEDULES

| | |
|---|---|
| SCHEDULE A | INITIAL AGREEMENT |
| SCHEDULE B.1 | PRITCHARD PROPERTY |
| SCHEDULE B.2 | PROPERTY |
| SCHEDULE C | AUTOMOBILES |
| SCHEDULE D | EQUIPMENT |
| SCHEDULE E | INVENTORY |
| SCHEDULE F | FUNERAL AND OTHER MATERIAL CONTRACTS |
| SCHEDULE G | RECEIVABLES |
| SCHEDULE H | PURCHASE PRICE ALLOCATION |
| SCHEDULE I | FINANCIAL STATEMENTS |
| SCHEDULE J | SELLER'S EMPLOYEES |
| SCHEDULE K | SELLER'S LEGAL OPINION |
| SCHEDULE L | OUTSTANDING LITIGATION |
| SCHEDULE M | ADA AND OSHA QUESTIONNAIRES |
| SCHEDULE N | DEED OF PROPERTY |

# EXHIBIT "B"

## EMPLOYMENT AND RELEASE AGREEMENT FOR EMPLOYEES
## OTHER THAN CORPORATE AND COUNTRY MANAGEMENT

THIS AGREEMENT, dated as of the _25 TH_ day of _JANUARY_, ~~1999~~ _2000_ (the "Effective

Date"), is entered into by and between _THE LOEWEN GROUP_, located at

_3205 WEST DAVIS, SUITE 200A, CONROE, TEXAS 77304_ (the "Company") and

_JEFFREY W. DEAN_ ("Employee").

WHEREAS, the Company has implemented the KERP (as defined below), pursuant to an

Order Authorizing Debtors and Debtors in Possession to Implement Key Employee Retention

Program issued by the United States Bankruptcy Court for the District of Delaware in Case

Number 99-1244 (PJW) on September 21, 1999 and an Order issued by the Superior Court of

Justice of Ontario in Court File No. 99-CL-3384 on September 24, 1999 (collectively, the

"Order"); and

WHEREAS, pursuant to the Order, Employee's eligibility to participate in and receive

payments under the KERP is contingent on Employee's agreeing to the matters set forth in

Articles III and IV hereof.

NOW THEREFORE, in consideration of the mutual covenants contained herein and for

good and valuable consideration, including participation in the KERP as applicable, the receipt

of which is hereby acknowledged, it is agreed as follows:

ARTICLE I

DEFINITIONS

> **EXHIBIT**
> **"B"**

The following terms shall have the respective meanings set forth below, unless the

context clearly otherwise requires:

1.1     "Affiliate" means, with respect to a particular Entity, an Entity that directly, or

indirectly through one or more intermediaries, controls, is controlled by, or is under common

control with, such Entity, and an Entity shall be "unaffiliated" with another Entity if such Entities are not Affiliates with respect to one another.

1.2    "Cause" means:  (a) neglect of duty, dishonesty or misconduct in matters involving the Company or the performance of services, (b) loss of qualification of licensure, (c) stealing or unlawful use of the Company's property or monies, (d) continued willful insubordination after reasonable warning or reprimand, (e) commission of a felony or any crime requiring intent or moral turpitude, (f) a violation of the Company's anti-harassment or drug use policies or (g) actively and intentionally pursuing interests of a competitor to the detriment of the financial interests of the Company.

1.3    "Competing Business" means an Entity which is in competition with any significant line of business conducted by the Company or an Affiliate including, without limitation, the funeral, cemetery or related businesses.

1.4    "Entity" shall mean any individual, trust, estate, partnership, corporation or any other form of business organization.

1.5    "KERP" means the Retention Incentive Plan, the Performance Incentive Plan, the Confirmation Incentive Plan and the Severance Plan, as approved by the Order.

## ARTICLE II

## CERTAIN OBLIGATIONS OF THE COMPANY

2.1    Employment.  Subject to the terms of this Agreement, the Company agrees to continue to employ Employee.  Employee and the Company agree that Employee is an at-will employee and nothing contained herein shall prevent (a) Employee from terminating employment with the Company for any reason or for no reason or (b) the Company from terminating Employee's employment with the Company for any reason or for no reason, subject to satisfaction of any applicable obligations under the KERP.  The Company may prepare a

summary of Employee's job description and duties, as amended from time to time, and such summary may be attached hereto as an Exhibit.

2.2     KERP Benefits.  The Company agrees to provide Employee with the benefits and payments to which Employee is entitled under the KERP, as in effect from time to time and as applicable to Employee's employment level in effect at the time such benefits and payments become due to Employee.

2.3     Other Employee Benefits.  Employee and Employee's family, as applicable, shall be eligible for participation in and shall receive all benefits to which they are entitled under the Company's other employee benefit plans, as in effect from time to time.

2.4     Successors and Binding Agreement.

(a)     The Company will require any successor to all or substantially all of the businesses or assets of the Company (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) expressly to assume and agree to perform this Agreement in the same manner and to the same extent the Company would be required to perform if no such succession had taken place.  This Agreement will be binding upon and inure to the benefit of the Company and any successor to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the businesses or assets of the Company whether by purchase, merger, consolidation, reorganization or otherwise (and such successor will thereafter be deemed "the Company" for the purposes of this Agreement).

(b)     This Agreement will inure to the benefit of and be enforceable by Employee's personal or legal representatives, executors, administrators, successors, heirs, distributees and legatees.

## ARTICLE III

### CERTAIN OBLIGATIONS OF EMPLOYEE

3.1     No Participation in Other Businesses.  While employed by the Company,
Employee shall not, without the consent of the Board of Directors of the Company, become
actively associated with or engaged in any Competing Business.  Employee shall devote
Employee's best efforts and full business time and attention (except for permitted vacation
periods and reasonable periods of illness or other incapacity) to the business and affairs of the
Company.

3.2     Trade Secrets and Confidential Information.

(a)     Unauthorized Disclosure, Use or Solicitation.  Employee will keep in strict
confidence, and will not, directly or indirectly, at any time during or after Employee's
employment with the Company, make available, disclose or use any trade secrets or confidential
business and technical information (except in the course of performing Employee's duties and
obligations under this Agreement).  Further, during Employee's employment and for a period of
two years after termination of Employee's employment with the Company, Employee shall not in
any manner, directly or indirectly, induce or attempt to induce any employee of the Company or
an Affiliate to quit or abandon his or her employment, or any customer, independent contractor,
consultant, supplier or vendor of the Company or an Affiliate to quit or abandon its relationship,
for any purpose whatsoever.

(b)     Post-Termination.  Employee agrees that, upon termination of Employee's
employment with the Company, for any reason, Employee will return to the Company, in good
condition, all property of the Company, including without limitation, the originals and all copies
of all management, training, marketing and selling manuals; promotional materials; other
training and instructional materials; financial information; vendor, owner, manager and product
information; customer lists; other customer information; and all other selling, service and trade

information and equipment.  If such items are not returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

3.3    Noncompetition.  Employee and the Company recognize that Employee's duties will entail the receipt of trade secrets and confidential information, which include not only information concerning the Company's current operations, procedures, suppliers and other contacts, but also its short-range and long-range plans, and that such trade secrets and confidential information may have been developed by the Company and its Affiliates at substantial cost and constitute valuable and unique property of the Company.  Accordingly, Employee acknowledges that the foregoing makes it reasonably necessary for the protection of the Company's business interests that Employee not compete with the Company or any of its Affiliates during the term of this Agreement and that, for a reasonable and limited period thereafter, the Employee not compete with the Company or any of its Affiliates in the same geographic area in which the Employee performs his services for the Company at the time of his termination of employment with the Company.  Therefore, (a) during the term of this Agreement, Employee shall not (i) render personal services to any Competing Business in any manner, including, without limitation, as owner, partner, director, trustee, officer, employee, consultant or advisor thereof ("Personal Services") or (ii) have any investment in a Competing Business other than a *de minimis* investment and (b) for two years after Employee's termination of employment, Employee shall not (i) render Personal Services to any Competing Business within a 25 mile radius of the Company-owned site to which Employee regularly reported at the time of Employee's termination of employment with the Company or (ii) have any investment in a Competing Business other than a *de minimis* investment.  For purposes of the preceding sentence, a *de minimis* investment is ownership of less than 1/2 of 1% of the outstanding equity or debt of any Competing Business.

Notwithstanding anything herein to the contrary, if Employee shall breach the covenants contained in this Article III, the Company shall have no further obligations to Employee pursuant to this Agreement and may recover from Employee all such damages to which it may be entitled at law or in equity.  In addition, Employee acknowledges that any such breach is likely to result in immediate and irreparable harm to the Company for which money damages are likely to be inadequate.  Accordingly, Employee consents to injunctive and other appropriate equitable relief that the Company may seek to protect the Company's rights under this Agreement.  Such relief may include, without limitation, an injunction to prevent Employee from disclosing any trade secrets or confidential information concerning the Company to any Entity, to prevent any Entity from receiving from Employee or using any such trade secrets or confidential information and/or to prevent any Entity from retaining or seeking to retain any other employees of the Company. Employee acknowledges good and sufficient consideration for the noncompetition and nonsolicitation covenants of  this Section.

ARTICLE IV

RELEASE

4.1   <u>Termination of Existing Arrangements</u>.  Employee agrees that (a) any employment or consulting agreements or other such arrangements, as such agreements or arrangements were applicable to Employee prior to the Effective Date (except such employment or consulting agreements or other arrangements which are listed on Exhibit A hereto) and (b) any Company programs with respect to retention or performance incentive payments or severance or similar benefits, as such payments or benefits were applicable to Employee prior to the Effective Date ((a) and (b) being collectively referred to as the "Prior Arrangements"), are hereby terminated.

4.2   <u>Release</u>.  Upon execution of this Agreement, Employee (a) releases and waives any rights or entitlements that Employee has or may have under any Prior Arrangements, (b)

releases and waives any claims for damages relating to or arising out of the termination or rejection of any Prior Arrangement during the Company's reorganization and (c) acknowledges that all severance payments provided for in the KERP are in lieu of and not in addition to notice or severance payments provided at law, whether statutory or otherwise.. Such release will not, however, apply to the ongoing obligations of the Company arising under this Agreement, or rights of indemnification Employee may have under the Company's policies or by contract or by statute.

4.3     Covenant Not to Sue.  Employee agrees that Employee will never file a lawsuit against the Company or any other third party asserting any claims released hereunder.

4.4     Breach.  Employee further agrees that in the event Employee breaches any of Employee's obligations hereunder or if the Company terminates Employee's employment with the Company for Cause, the Company shall have the right to demand the repayment of all or a portion of any amounts paid to Employee under the KERP and, in addition, (a) the Company shall have no further obligation to Employee pursuant to this Agreement and (b) Employee shall pay any expenses or damages incurred by the Company or its Affiliates as a result of said breach or as a result of the activities giving rise to the termination for Cause, including all costs incurred by the Company or its Affiliates, including reasonable attorneys' fees, in defending against any claims released in Section 4.2 hereof.

4.5     Release Agreement.  Employee acknowledges that this Agreement constitutes a "Release Agreement" as described in any component of the KERP.

## ARTICLE V

## MISCELLANEOUS

5.1     Assignment.  This Agreement is personal in nature and neither of the parties hereto will, without the consent of the other, assign, transfer or delegate this Agreement or any rights or obligations hereof except as expressly provided in Sections 2.4(a) and (b).  Without

limiting the generality or effect of the foregoing, Employee's right to receive payments hereof will not be assignable, transferable or delegable, whether by pledge, creation of a security interest, or otherwise, other than by a transfer by Employee's will or by the laws of descent and distribution and, if Employee attempts any assignment or transfer contrary to this Section 5.1, the Company will have no liability to pay any amount Employee attempts to  assign, transfer or delegate.

5.2     <u>Governing Law; Arbitration</u>.  This Agreement has been executed on behalf of the Company by an officer of the Company located in the City of *ConRoE, TEx AS* This Agreement and all questions arising in connection with it shall be governed by and construed in accordance with the laws of the jurisdiction in which Employee ordinarily is a resident.  Subject to the following sentence, all disputes arising out of, or in connection with this Agreement, which are not promptly settled by  mutual agreement of the parties hereto, shall be finally settled by arbitration in accordance with the rules of the American Arbitration Association or the Rules of the Arbitration and Mediation Institute of Canada, as appropriate.  Notwithstanding anything herein to the contrary, the Company may, at its option, seek injunctive relief as contemplated in Article III above either in lieu of or in addition to the arbitration remedies provided for in this Section.

5.3     <u>Severability</u>.  If any portion of this Agreement is held to be invalid or unenforceable, such holding shall not affect any other portion of this Agreement.

5.4     <u>Entire Agreement</u>.  This Agreement comprises the entire agreement between the parties hereto and, as of the date hereof, supersedes any prior agreements between the parties. This Agreement may not be modified, renewed or extended except by a written instrument referring to this Agreement and executed by the parties hereto.

5.5     <u>Notices</u>.  Any notice or consent required or permitted to be given under this Agreement shall be in writing and shall be effective (a) when given by personal delivery,

(b) one business day after being sent by overnight delivery service or (c) five business days after being sent by certified or registered mail, return receipt requested, to the Secretary of the Company at its principal place of business in the City of _Burnaby, BC_ or to Employee at the last known address of Employee as shown on the records of the Company.

5.6   <u>Withholding Taxes</u>.  The Company may withhold from any amounts payable under this Agreement all federal, state, provincial, city or other taxes or other amounts as shall be required pursuant to any law or governmental regulation or ruling.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

THE COMPANY

By: _____

Name: _Richard S. McCarthy_

Title: _Regional Manager, S.E. Fla._

_____

Employee

# EXHIBIT "C"

## New owners add happy hour at WAX

BY MICHAEL HASKINS
Citizen Business Writer

WAX, known as a popular late-night dance club, has new owners and is trying to attract a late afternoon crowd with a daily themed happy hour from 4-9 p.m.

"We are opening earlier and hope to bring in the happy hour crowd," said Rudi Armbruster. "Monday afternoon we have 'Lick up'' up with Les. Les is a local hairstylist and a lot of his customers and friends come in. It's almost like a party at Les' house."

The Armbruster brothers, Rudi and

Dan, are also planning a bartender of the afternoon happy hour.

"We would invite a popular local bartender in and he or she could design the bar's atmosphere and choose their own style of music for the happy hour," Dan said. "We want to bring in people who might not come into WAX otherwise."

"I think if we could get people in, they would come back," Rudi added. "If not for the night, at least for the happy hour."

The brothers haven't changed the interior since buying the business. Is-

See WAX, page 2D

## Funeral family moves to Big Pine

BY MICHAEL HASKINS
Citizen Business Writer

Jeffrey Dean calculates his family has been in the funeral business for 100 years and in the last 10-12 years he's seen some big changes in how families and individuals deal with death.

"I think the baby-boom generation is bringing changes to the funeral business," said Dean, 43, last week. "People are getting away from the 'Amazing Grace' music and are more into the celebration of the deceased's life. I

hear it in the music that is being played and the mood of the funeral participants."

Dean, who followed his father, Robert, in the funeral business, has spent 27 years in the business, mostly in Key West.

"The family sold our funeral business in Key West in 1992," he recalled. "I continued to be involved in the business, but wanted something more. I wanted to continue practicing the way my father taught me. We are

See FUNERAL, page 2D

ay the patio bar is
*onnie Netherton has*
*v patio since April and*
at the patio in June.

*ic Cigars store will*
ng from 5-7 p.m.
*us Bar at the AmB*
*nt is free, but you*
*í — see Steve Sullivan*
gars to bring.
'll hold another cigar
p.m., Aug. 28 at
' and include cigars
ns are a must, since
*; first 50 who call*
dy called'

did you get one of the
hes they passed out!

See HASKINS, page 2D

KEYS CLASSIFIEDS INSIDE

(classified advertisements for autos, trucks, boats, and other merchandise)

KEY WEST AUTO WEB
295-8858
AmB10, Big Coppitt

CARS
Autos & Trucks

TRUCKS

Cates Auto Sales
A Service

$8,995

EXHIBIT
"C"

# Funeral

Continued from page 1D



*y red walls with martinis lit by a glowing*
MIKE HENTZ/The Citizen

a family operation."

When the Memorial Gardens Cemetery and Chapel — 31140 Overseas Highway — on Big Pine was put up for sale, Dean decided to buy it.

"I saw the opportunity and I worked with the family that owned the business, and in March I bought it," Dean said. 

Dean

"My father is retired, but he's here to help me whenever I need it."

The Memorial Gardens is 16 acres and only five acres have been developed. It has been on Big Pine for about 25 years. The potential for expansion is one of the reasons Dean wanted the business.

Dean and Sons Funeral Home is a full service business offering funeral services, a cemetery and cremation, along with embalming services.

"The funeral home and chapel were built about 12 years ago," Dean said. "I believe being here will help lower costs for funerals and burials."

Before the end of the year, a licensed crematorium will be built on the site. Dean and Sons offers the service now, but the cremation is done in Miami.

"I oversee everything involved with the cremation," Dean said. "I go to Miami and see everything is done correctly. I personally witness everything."

## Cremation oversight

Dean said the horror stories from Georgia about the crematorium scandal there hurt the business, but he was impressed with how quickly the state of Florida did a sweep of its licensed crematoriums to see everything was in order.

> "About 25 years ago, cremation accounted for about 10 percent of the funeral business. Today it's 50-50. Half the people want cremation, half want interment."
>
> Jeffrey Dean,
> funeral home owner

"I don't understand how Georgia did not control the situation," he said.

Funeral directors and crematoriums need a license in Florida to operate. Right now the only crematorium in the Keys is in Key West.

"About 25 years ago, cremation accounted for about 10 percent of the funeral business," Dean said. "Today it's 50-50. Half the people want cremation, half want interment."

While cremation has begun to be accepted in the United States, Dean said it has been an accepted way in many countries around the world for years. He credits the Catholic Church's recent acceptance as one reason for the increase in cremations.

## Planning ahead

As the funeral business changes, one important thing remains.

"Pre-arranged funeral arrangements are very important," Dean said. "When a person dies, the people responsible for the arrangements are usually emotional — that's normal — so, coming in early makes it easier for the living and makes sure the deceased receives the services he or she wants."

Dean and Sons offers cemetery services that include in ground interment and above ground mausoleums.

"We are in the process of developing a cremation garden where people will be able to have urns buried," Dean said. "Things are changing in this business, and I believe being a family-owned business will help us usher in these changes, and that's exciting."

as on the club's vibrant red walls.

"We're working out the framing, but the prints are dramatic against the walls and will add a little something new to the club," Rudi said.

While the brothers are enjoying their new endeavor, they have had some challenges to overcome.

"I think our biggest challenge is getting accepted by our customers," Dan said. "There were a lot of rumors at first about our making changes and that kept some people away."

"We heard all kinds of rumors," Rudi said. "We were changing this, that and so on. We are not changing, but we are improving. Like adding guest DJs and the happy hour."

Everyone they dealt with told them the happy hour would never work.

"Our theme happy hours have been successful," Dan said. "That is the change we are bringing to WAX — otherwise it's the same dance club it was before we bought it."

# COMPOSITE EXHIBIT "D"

# keysnews.com
### FLORIDA KEYS
### The Florida Keys Only Daily Online News

KEY WEST   MARATHON   ISLAMORADA   KEY L

Mon, Ju
WEATHER

NEWS
Current Stories
Mile Markers
Crime Reports

OPINION
Editorials
Commentary
Letters
Citizen's Voice

SPORTS
Today in Sports
Scores & More

BUSINESS
This week
Columns
Tech Talk
Biz Directory
Real Estate Net

KEYS LIFE
Lifestyles
Homes
Kudos
Columns

THE ARTS
Features
Columns

PHOTO GALLERY
View Photos

COLUMNS
Commentary
Entertainment
Keys Life
Health
Food
Real Estate

OBITUARIES
Death Notices

DEATH NOTICES

# Obituaries

## CARL W. WEEKLEY SR.

Carl W. Weekley Sr., 93, passed away surrounded by his family on Sunday, July 28, 2002, at Florida Keys Memorial Hospital after a short illness. He was born on Aug. 6, 1908, in Moultrie, Ga.

He is survived by Ann, his wife of 58 years, his three sons and their wives: Carl Jr. and Ann of Lake Placid, Fla., Jimmy and Susan of Key West; and Alton and Beverly of Dover, Fla.; grandchildren: Jimmy and Cayce Weekley of Chattanooga, Tenn., Nikki Weekley of Lakeland, Fla., Dakin Weekley of Olympia, Wash., and J Weekley of Dover, Fla.; four great-grandchildren, his nephew, C. Wayne Simons of Haines City, Fla., close cousins Hoyt and Doris Smithwick of Albany, Ga.; other cousins and friends. He was preceded in death by his parents, James and Beulah Weekley, his children, Dennis and Patricia, and his sister, Corinne Simons.

Carl served in the U.S. Navy during World War II with assignments in Key West and the Pacific. After his military service, he returned to Key West. He and Ann operated Fausto's Food Palace from 1945 until his retirement in 1992.

Carl was a member of St. Mary's Catholic Church and the Veterans of Foreign Wars. He also participated in the Key West Chapter of the American Red Cross as a member of the Hurricane Preparedness Committee for many years.

Visiting will be held from 6-8 p.m., with a rosary service at 7 p.m., Monday, July 29, at St. Mary's Church. Funeral services will be held on Tuesday, July 30, at 10 a.m. at St. Mary's Church. Interment will follow at the big Coppitt Key Cemetery. Dean and Sons Funeral Home of Big Pine Key is in charge of arrangements.

## JAMES ARLEN RANDALL

James Arlen Randall died July 27, 2002, at Mount Sinai Hospital in Miami Beach, Fla.

CITIZ
"What's up
in this town'
skyrocketed
all of us who
and have ki
college and
Go to Article

TOPIC
• 'One
  red fi

• Key
  prop
  taxes
  enfor

• Yard
  Key
  syna
  refun

• Natic
  Geog
  featu
  Marie

• HOM
  THE
  home

FISHIN



EXHIBIT
COMPOSITE
"D"

everyone suffers equally in ight market.

"The peril of terrorism is not great," said Tami Torres, spokeswoman for the state's insurance department.

According to Torres, "the majority of businesses in Florida

said his group's property insurance premiums also doubled this year.

"Every extra penny paid out to an insurance company means I can't help a family whose child has Down Syndrome," Bomzer said.

ROB O'NEAL/The Citizen

John Stanford was born in Lake City and visited Key West several times before moving to the Keys 10 years ago. Stanford is a real estate appraiser and enjoys living and working in a tropical environment.

---

# OBITUARY

8/5/02

## JAMES A. WHITE

The soul of "The Great Jim White," 78, soared into the wild blue yonder Sunday, Aug. 4, after an extended illness.

A former private pilot and avid radio-controlled model airplane hobbyist, he often shared his passion of "flying" with his late buddy, Nilo Rodriguez. Jim was a World War II Navy veteran, graduate of the University of Miami, sales representative with Japan Airlines and Delta Airlines, professional photographer, and jazz and classical music enthusiast and collector.

He was preceded in death by his parents, Charles White and Anne Kaiser; brother George White; and beloved in-laws, Laureano and Petra Moreno.



White

He is survived by his loving wife and devoted caregiver of 52 years, Beatrice; daughter Sharon Barker of Jacksonville; sister Carol Ann Trupin of Cincinnati, Ohio; sister-in-law and brother-in-law Elissa and Chester Knowles; nieces Tina (Jamie) Webb, Sharyn (Joey) Ramirez and Vikki Trupin; nephew Chester T. Knowles Jr.; great-nieces Marisa and Alexis Ramirez; great-nephews Christopher and Michael Webb; two grandchildren and three great-grandchildren.

Visitation will be held at St. Mary's Star of the Sea Church on Wednesday from 3-4 p.m. with funeral services following at 4 p.m. Father Paco Hernandez will officiate. Burial to immediately follow at the Key West City Cemetery. Funeral arrangements are being handled by Dean & Sons Funeral Home of Big Pine Key.

In lieu of flowers, donations may be made to St. Mary's Star of the Sea Educational Fund.

### OBITUARY POLICY

Paid obituaries are published once unless the family or funeral home is willing to pay for reruns. Obituaries up to six inches are $80; $70 with a photo. Those more than six inches will be charged $10 an inch. Free death notices list only the name of the person who died and where services will be held. Obituaries may be edited to conform with Citizen style and usage.

Get the best deal in the Keys. Subscribe to The Citizen. Call 292-7777.

**GUN FOR HIRE**
Macintosh & Web Expert
"Switch to Mac" Consulting
Set up, Training,
Brochures, Marketing, P.R.
**CALL JOE 294-4546**

**NOW MOBILE**
**DR. CROSS**
**House Call Vet!**
(305) 294-9531
Call today for an appointment.
Same friendly service at your doorstep!

**COOPERS BODY SHOP**
Nobody Does it Better
**294-5581**

**KEY LIME PIE**
**& SANDWICH CO.**
Home of Reny's Mom's
Key Lime Pie—
Daily 8am - 10pm
294-3119 · 500 Truman

**Remarkable New**
**"NO DOCUMENTATION"**
**Mortgage Program**
**With Excellent Interest Rates!**
**(PURCHASE OR REFINANCE)**

We WON'T ask where you work, how long you have worked or how much you earn!

We WON'T ask where you bank or how much is in your accounts!

We WON'T ask for tax returns, W-2's, paystubs or bank statements...

We WILL need to verify that you have established a reasonably good credit history (you do not have to be perfect).

We WILL require that you have a pulse and are breathing at time of closing.

The response to this new program has been tremendous, but some people have been skeptical. We have now closed over a dozen mortgage loans under this program and it is all true!

Plus, the interest rates are SURPRISINGLY LOW!!!

**CALL TODAY AND WE WILL PROVE IT!**

*Oliver Blake Mortgage, Inc.*
**292-9982 or 745-1540**

*Happy Birthday to our special angel in heaven*

*Dorthy Gomez Moore*
*August 05, 1923 - May 20, 2002*

*We love and miss you, Love forever, Your children and grandchildren and great grandchildren.*

**Ain't no if, and or maybe -**



**This old boy's 50, but he's still a Baby!**
**(Baby's Coffee, that is)**
**Happy Birthday, Gary Teplitsky,**
**From the whole Baby's Crew & family!**

# OBITUARIES

HURRICANE SEASON 2002

For the latest updates on storms, log on to keysnews.com/stormcentral

## JAMES A. WHITE

The soul of "The Great Jim White," 76, soared into the wild blue yonder on Aug. 4, 2002, after an extended illness.

A former private pilot and avid radio-con- trolled model airplane hob- byist, he often shared his passion of "flying" with his late buddy, Nilo Rodriguez. Jim was a World War II Navy veteran, graduate of University of Miami, sales rep- resentative with Japan Airlines and Delta Airlines, professional photographer, and jazz and classical music enthusiast and collector.

He was preceded in death by his parents, Charles White and Anne Kaiser; brother, George White; and beloved in-laws, Laureano and Petra Moreano.

He is survived by his loving wife and devoted caregiver of 52 years, Beatrice; daughter, Sharon Barker, of Jacksonville; sister, Carol Ann Trupin, of Cincinnati, Ohio; sister-in-law

and brother-in-law, Elissa and Dean & Sons Funeral Home of Chester Knowles; nieces Tina Big Pine Key.
(Jamie) Webb, Sharyn (Joey) Ramirez, and Vikki Trupin; nephew Chester T Knowles, Jr.; great-nieces Marina and Alexis Ramirez; great-nephews Christopher and Michael Webb, two grandchildren and three great-grandchildren.

Visitation will be held at St. Mary Star of the Sea Church on Wednesday from 3-4 p.m. with funeral services following at 4 p.m. Father Paco Hernandez will officiate. Burial to immedi- ately follow at the Key West City Cemetery.

In lieu of flowers, donations may be made to St. Mary Star of the Sea Educational Fund. Funeral arrangements by

## WILLIAM C. STONE III

William C. Stone III, born in Milford, Conn. July 27, 1950, passed away on July 29, 2002, after a long and brave struggle with Hodgkins lymphoma as a result of Agent Orange exposure after serving his country during the Vietnam conflict.

Stoney served in Vietnam from 1969 to 1971 and eventual- ly moved to Key West where he lived for 25 years and worked for the Naval Air Station Boca Chica as a maintenance worker for 15 years. After moving to Brownsboro, Ala. in 1998, in order to accompany his wife to her new federal position, Stoney

began working for the Army Corps of Engineers as a mainte- nance worker up until his recent death, completing a total of 22 years Navy, Army and federal service.

He is survived by his best friend, and wife, Robin, of Brownsboro; his father, step- mother, two sisters; and two nieces, all residing in Connecticut.

Stoney will be deeply missed, but should be remembered for

his fun-loving spirit, enjoyment of the beautiful waters of Key West, love for fishing and real enjoyment of life. He also was very involved in softball and playing bocce while living in Key West.

Stoney's ashes will be scat- tered off the waters of Key West later in the year so that he can go back to the most peaceful place on earth. Smile as you remem- ber him. He's out there trying to catch the big one!

DEAN LOPEZ FH

**Private Duty Caregiver**

---

**HELP SAVE OLD TOWN**
www.livableoldtown.com
Celebrating 10 Consecutive Years As People's Choice Award Winner!!
**Voted Best Oriental Restaurant!!**
1993-2002

FREE DELIVERY
China Garden West
Searstown Shopping

15% OFF DINNER 10% OFF LUNCH (DINE IN ONLY)
coupon must be presented

---

**FILL 'ER UP!!**
P-ROCK • SAND • SOIL
YELLOW BRICK ROAD
296-1617

---

**\*\*ADOPTION\*\***
Living and medical expenses paid. Free counseling. Loving, stable, financially secure families wish to give best life can offer to your child. Adoption designed to meet your needs. Confidential.
Ginger S. Allen, Attorney, #57215.
Call 800-348-0457.
www.adoptionflorida.org

---

**Remarkable New "NO DOCUMENTATION" Mortgage Program**
With Excellent Interest Rates!
(PURCHASE OR REFINANCE)

---

**The Goodrich Families**

**G & M**
Collision Repair Center
EXPERT COLLISION REPAIR & REFINISHING
24 HR. AUTO GLASS
Discount Auto Glass
UNLOCK SERVICE
Don't Be Fooled All Repair Facilities Are Not All the Same
296-6485

Insurance Claims Handling

---

**PUBLIC NOTICE**
Dean & Sons Funeral Home
Cemetery and Cremation Services

Representing the 4th & 5th Generations of Funeral Service Providers in Monroe County

class-size cap have said that another study, conducted by the

people:
he state already news
as were
of the scl- and the Centers for and the
It is the West by the new in the mean
several in that stated. brain. ed 161 18 first pland in

olds by 2005.

The class size petition drive

the position to serve as an advis- er on education issues.

# OBITUARIES

## ROSE MARIE ATWELL GASKINS

Rose Marie Atwell Gaskins, 75, a Key West native, died July 27, 2002 in New Bern, N.C.

Funeral services will be at 3 p.m. Wednesday at Pollock-Best Chapel in New Bern with the Rev. Lynn Maxwell officiating. Burial will follow at Greenleaf Memorial Park.

Arrangements by Pollock-Best Funerals & Cremations, New Bern, N.C.

## EDITH MAE RUSSELL

Edith Mae Russell, 85, born in Key West on April 4, 1917, passed away July 27, 2002, in Leesburg, Fla.

A memorial service will be held at 2 p.m. Thursday at Community United Methodist Church in Fruitland Park, Fla.

## GUMERSINDO "GUMME" RODRIGUEZ

Gumersindo Rodriguez, 90, of Key West, passed away July 27, 2002.

"Gumme" Rodriguez, 90, of Key West,

with the Rev. Ian Corbin officiating.

Arrangements by Hiers-Baxley Funeral Services, Lady Lake, Fla.

The family will receive friends from 6 p.m. to 8 p.m. Wednesday in the Chapel of the Dean-Lopez Funeral Home.

Funeral services will be held at 10a.m. Thursday in the Chapel of the Dean-Lopez Funeral Home with burial following in the Key West City Cemetery. Arrangements by Dean-Lopez Funeral Home.



## VIAGRA

WE WRITE AND FILL YOUR PRESCRIPTION
NO CONSULTATION FEE • LOWEST PRICES
KEY WEST OUTLET FOR IMMEDIATE PICK-UP
FREE SHIPPING TOLL FREE 1-888-459-0256

## THE HICKORY HOUSE

RESTAURANT • SMOKEHOUSE • BBQ DOCKS
Daily 11am–10pm • 292-2211
End of Maloney Ave., Stock Island

## Remarkable New "NO DOCUMENTATION" Mortgage Program
With Excellent Interest Rates!
(PURCHASE OR REFINANCE)

We WON'T ask where you work, how long you have worked or how much you earn!

We WON'T ask where you bank or how much is in your accounts!

We WON'T ask for tax returns, W-2's, paystubs or bank statements.

We WILL need to verify that your income is reasonably good credit history (does not have to be perfect.)

We WILL require that you have a paste and are breathing at time of closing.

The response to this new program has been tremendous, that some people have been so excited... We have even closed over a dozen mortgage loans under this program and it is all true!

Plus, the interest rates are SURPRISINGLY LOW!!!

Please give me a call
Tel 305-293-7979

## KEY LIME PIE & SANDWICH CO.
Home of Rosie's Key's

Key Lime Pie
Daily 9am - 10pm
294-9118  500 Truman

## HELP SAVE OLD TOWN.
Key West Citizen 7/30/02
WWW.livableoldtown.com

## PUBLIC NOTICE

Dean & Sons Funeral Home
Cemetery and Cremation Services

Representing the 4th & 5th Generations of Funeral Service Providers in Monroe County

Jeffrey W. Dean & Family Are No Longer Affiliated With Dean Lopez Funeral Home, Pritchard Funeral Home, or any Key West Funeral Home.

## **ADOPTION**

Living and medical expenses paid. Free counseling. Loving, stable, financially secure families wish to give best life can offer to your child. Adoption designed to meet your needs. Confidential. Ginger S. Allen, Attorney.
Call 800-348-0467
www.adoptionflorida.org
#57215.

## CRABBY DICK's Customer Appreciation Steak Fest!

KEY WEST
712 Duval Street
(Free Parking in rear)
July 18 - Aug. 1
Mon. - Thurs.
Open to Close.

3 Course Dinner
include: Caesar Salad,
12oz Ribeye Cowboy Steak
& Homemade Key Lime Pie

$19.49

Regular Menu Also Available

## FLORIDA KEYS
eWS.com
Business Directory

Over 180,000 people visit keysnews.com each month

Advertise Your Business in the Business Directory
3 months . . . $75
6 months . . . $135
12 months . . . $250

Call 305.292.1880 or email sales@floridakeys.com

## Send Your Papers to School

While you're away, donate your papers to our schools. Students will appreciate it. Parents will appreciate it. Schools will appreciate it. Children will read.

## The Goodrich Families
G & M
Collision Repair Center

Insurance Claims Handling
EXPERT COLLISION REPAIR & REFINISHING
Discounts on All Glass
24 HR. TOWING & UNLOCK SERVICE
Don't be fooled! All Repair Facilities Are Not The Same.
296-6485





NOV-01-2002 THU 10:47 PM   DEAN LOPEZ FH   3052988572   P. 18

wastewater board, no agreements can be worked out with the county, but Nelson hopes the loan will turn out to be a grant.

During the meeting, the commissioners agreed that a referendum would be placed on the November ballot for Key Largo voters, asking them if they would support the addition of an 0.5 mill tax to their at

said.

"We would still manage [without it], but it would be much easier to have the 0.5 mill on hand. That way everyone is a winner," he said. "The wastewater board would have additional money and could begin planning for the next phase."

sgibbs@keysnews.com

enues from property taxes as those in the current budget, essentially meaning no tax increase for property owners.

The single largest addition to the submitted budget came from a request for four more police patrol officers at $209,133 — or an additional $5.95 per $100,000 taxable value in property owners' tax bills — and an

plant and consideration of hauling trash to the mainland.

● Aug. 8 the sewer, solid waste and stormwater budget for 2002-03 will be presented.

● Public hearings on votes on the budget and millage rate will be held at 6 p.m. Sept. 5 and 12, Old City Hall, 510 Greene St.,

pdeluca@keysnews.com

---

*Key West Citizen 7/29/02*

# OBITUARIES

## CARL W. WEEKLEY SR.

Carl W. Weekley Sr., 93, passed away surrounded by his family on Sunday, July 28, 2002, at Florida Keys Memorial Hospital after a short illness. He was born on Aug. 6, 1908, in Moultrie, Ga.

He is survived by Ana, his wife of 58 years, his three sons and their wives: Carl Jr. and Ann of Lake Placid, Fla., Jimmy and Susan of Key West; and Alton and



Weekley

Beverly of Dover, Fla.; grandchildren: Jimmy and Cayce Weekley of Chattanooga, Tenn., Nikki Weekley of Lakeland, Fla., Dakin Weekley of Olympia, Wash., and J Weekley of Dover, Fla.; four great-grandchildren; his nephew, C. Wayne Simons of Haines City, Fla., close cousins

Hoyt and Doris Smithwick of Albany, Ga.; other cousins and friends. He was preceded in death by his parents, James and Beulah Weekley, his children, Dennis and Patricia, and his sister, Corinne Simons.

Carl served in the U.S. Navy during World War II with assignments in Key West and the Pacific. After his military service, he returned to Key West. He and Ana operated Fausto's Food Palace from 1945 until his retirement in 1992.

Carl was a member of St. Mary's Catholic Church and the Veterans of Foreign Wars. He also participated in the Key West Chapter of the American Red Cross as a member of the Hurricane Preparedness Committee for many years.

Visiting will be held from 6-8 p.m., with a rosary service at 7 p.m., today at St. Mary's Church. Funeral services will be held on

Tuesday, July 30, at 10 a.m. at St. Mary's Church. Internment will follow at the Big Coppitt Key Cemetery. Dean and Sons Funeral Home of Big Pine Key is in charge of arrangements.

Flowers can be delivered to St. Mary's Church between 2 -5 p.m. today.

---

## JAMES ARLEN RANDALL

James Arlen Randall died July 27, 2002, at Mount Sinai Hospital in Miami Beach, Fla.

He lived in Key West and was the graphics engineer for Southernmost Signs at the time of his death. A computer systems engineer, he lived in Hartsdale, N.Y., from 1979 through 2000, prior to moving to Key West. In New York, he had been employed by Baldwin Computer Graphics.

Randall, 61, was an avid out-

doorsman. He was a recreational sailor, a licensed pilot and a certified scuba diving instructor. He recently was certified in scuba ice diving two years after receiving a heart valve replacement.

Randall was born Nov. 13, 1940, in Port Arthur, Texas, the son of Eugenia Landry Randall and James Randall. He graduated from Thomas Jefferson High School in 1960. He attended Lamar University. He served in the U.S. Navy for four years.

Survivors include his wife, Margie Kahaner Randall, of Key West; four children: Josh Randall of Austin, Texas, Jay Randall of Chandler, Ariz., Juleen Randall Carriere of Groves, Texas, Jennifer Randall Almquist of Owasso, Okla.; and two stepchildren, Andrew Schonebaum of Jackson Heights, N.Y., and Jennifer Schonebaum Catalano of Boston, Mass. Other survivors



NOW MOBILE
DR. CROSS
House Call Vet!
(305) 294-9551
Call today for an appointment
Same friendly service at your doorstep!



HELP SAVE OLD TOWN
www.livableoldtown.com
Pd. Pol. Adv. Committee for a Livable Old Town



KEY LIME PIE & SANDWICH CO.
Home of Roma's Mom's
Key Lime Pie
Daily 8am - 10pm
294-9118    500 Truman



THE HICKORY HOUSE
RESTAURANT  FISH HOUSE, RAR DOCKS
Daily 11am-10pm ● 292-2211
End of Maloney Ave., Stock Island



The Goodrich Families
G & M
Collision Repair Center
Insurance Claims Handling
EXPERT COLLISION
REPAIR & REFINISHING
Discount Auto Glass
24 HR. TOWING &
UNLOCK SERVICE
Don't Be Fooled! All Repair
Facilities Are Not The Same.
296-6485



Dean-Lopez Funeral Home
serving the Keys since 1869
• Funeral Arrangements made at your residence in Marathon or we provide free Limousine Service to our Chapel
• Offering complete Traditional Funerals in Marathon
• Cremation Service
• World Wide Shipping Service
Funeral Directors
available 24 hours
Serving all of the Florida Keys
305-294-1066



CRABBY DICK's
Customer Appreciation Steak Fest!
$19.49
KEY WEST
712 Duval Street
(Free Parking in rear)
July 18 - July
Mon. - Thurs.
Open to Close
3 Course Dinner
includes: Caesar Salad,
12oz Ribeye Cowboy Steak
& Homemade Key Lime Pie
Regular Menu Also Available

# amage found from speedboat off Looe Key

one of the Florida Keys' most pristine coral reefs at speeds as high as 40 mph, and, sent snorkelers fleeing for safety.

After striking the hard bottom, the boater, who apparently had unfamiliar with the area, he was set out from Islamorada and was on his way to Key West, report

edly tried to flee. Apparently unfamiliar with the area, he was quickly intercepted by law enforcement officers.

## OBITUARIES

### WILLIAM "BILL" LLOYD GUILLOT

Marathon Lane, Ft. Lauderdale, FL 33312.

Bill Guillot, 53, died in Miami on Aug. 26, 2002, after a long battle with leukemia.

The Guillots lived in Key West during the 1990s, where Bill was the manager of Sears.

He is survived by his wife Ellen; a daughter, Tracy, and her husband Bill; a son, Tommy; and his wife, Teense; two grandchildren, Taylor and Gina; his parents, Myrtle and Carroll Guillot and a brother, Kurt Guillot.

A memorial service will be held at 2 p.m. today at St. Elizabeth Ann Seton Church in Coral Springs.

In place of flowers, you may wish to make a donation to the Leukemia and Lymphoma Society at (954) 961-3234. Messages of condolence may be sent in Bill's family at 2543

### JOSEPH ANTHONY PILOTI

Joseph Anthony Piloti, 14, of Little Torch Key, died August 25.

Joseph was a result of a diving accident. He was a freshman at Marathon High School.

Joseph was born in Key West on November 20,1987, and attended Sugarloaf Elementary and Middle School. His favorite pastimes included diving, fishing, weight training and music. He was a member of St. Peter Catholic Church.

He is survived by his parents, Joseph Piloti and Cheryl Guest and stepfather, Christopher Rackley; grandmother and grandfather, Carol and Herbert Guest; his aunt, Kandi Ballard,

Lori Piloti, Debra Himsel, Kelly Holroyd and Megan Geiser; his uncles, William Ballard, Brian Himsel, James Holroyd, Kerry Bibber, Gene Martinez and Mark Rackley; his cousins, Rachael and Scott Ballard, Julie, and Jeffery Holroyd, Jeremy and Brian Himsel, David Lewis, Kyle Martinez, and many more family and friends.

A wake and rosary service will be held from 6 p.m. to 8 p.m. today at St. Peter Catholic Church on Big Pine Key.

In place of flowers, a trust fund has been set up for a class that will educate his friends and dive partners on diving safety and CPR.

All donations should be dropped off or mailed to the office of Meyer & Erskine, P.A., 31211 Avenue A, Big Pine Key, FL 33043, in care of the Joseph Key.

All donations should be sent to the Piloti Trust Account, in the Arrangements by Dean & Sons Funeral Home Cemetery and Cremation Services of Big Pine





Willie T's
FOOD 'til 2AM
525 DUVAL

STRAMOUR
A/C Inc.

Budde's
OUTLET SUPPLY
HOBBIES
Remote Control Cars & Trucks

CLASSICAL GUITAR STUDIO
INDIVIDUAL LESSONS & GUITAR ENSEMBLE
WITH MATTHEW JAMPOL
296-3824

HOME SCHOOL HIGH SCHOOL
Now Accepting Applications
292-0675

G & M
Collision Repair Center
The Goodrich Families
Insurance Claims Handling
EXPERT COLLISION REPAIR & REFINISHING
Discount Auto Glass
24 HR. TOWING & UNLOCK SERVICE
Don't Be Fooled! All Repair Facilities Are Not The Same!
1-296-6485

Labor Day DEADLINES
...for the Citizen:
DISPLAY ADS & LEGALS
Publish
The Citizen-Wed., Sept. 4
Paradise-Thurs., Sept. 5
Southernmost Flyer-Fri., Sept. 6
Deadline
Fri., Aug. 30, 2pm
Fri., Aug 30, 3pm
Fri., Aug. 30, 4pm

10/31/02

# OBITURIES

## WILLIAM A. "BILLY" GATES

William A. "Billy" Gates, 51, passed away Oct. 28, 2002, at his home in Key West unexpectedly.

Billy was born Oct. 11, 1951, in Key West, the son of Clarence "Willie" Gates and Marguerite Gates of Key West. Billy was a lifetime resident of Key West and was a 30-year employee of the city of Key West to which he had dedicated his life. His last years were spent helping friends, family and the many residents of Key West in need to deal with their losses through his position as assistant to the section of the Key West City Cemetery.

Billy's easygoing manner and loving kindness will be missed by all who knew him. He was a



long-time member of The First Congregational Church of Key West. In years gone by, Billy was active in the Key West Bowling Leagues, a real movie buff.

He was preceded in death by his father, Willie Gates, in 1992, and his mother, Marguerite, in 1995, and one sister, Doris "L" Baker.

Survivors include his two sisters, Linda M. and husband Dale Smith, of Key West, Faye and husband David Whitaker, of Sanford, Fla.; one brother, Jerry and wife Brenda Hargrave, of Alabama; his loving aunts, Florence Key of Key West, Sylvia Van Dresser, of Jacksonville, Fla., and Doris Davies of Georgia; his nieces and nephews, Karen Santana, Diane Metcalf and Pipo Mantilla, Brian and wife Tanya Baker, Cindy and husband Duane Scott, Dawn and husband Chris Hess, Holly and husband Jeremy Green, Robert Smith, Elaine Smith, Dannette Santana, David Santana, and Isabella Mantilla; also numerous cousins.

The family will receive friends from 5-7:00 p.m. today at the First Congregational Church, 527 William St., Key West Funeral services will be held and officiated by the Rev. Ron Paige at 4 p.m. Friday, Nov. 1, 2002, at The First Congregational Church. Burial to follow in the Key West City Cemetery.

Jeffrey W. Dean and the staff of Dean & Sons Funeral Home Cemetery and Cremation Services of Big Pine Key, Fla., are in charge of all arrangements.

## CHARLES BIRTON MILORD

Charles Birton Milord, 81, of Ocala, Fla., a native of Key West, passed away Oct. 18, 2002, at Munroe Regional Medical

Center West.

Arrangements by Hiers-Baxley Funeral Services, Timber Ridge Chapel, Ocala, Fla.

## ROBERT R. ROGEL

Robert R. Rogel, 78, of Key West, passed away Oct. 27, 2002.

He is survived by a loving wife, Angela, of Key West; a brother, Orlando (Clare) belle), of Key West; a sister, Carmen, of Ocala; two stepsons, Silvio (Joan) Garcia, of Key West and Henry (Indy) Garcia, of Georgia; one stepdaughter, Orchid (Joe) Galletti, of Pennsylvania; and five grandchildren, Chris, Maria,

## CHARLOTTE E. PRATT

Charlotte E. Pratt, 81, passed

ience, but this arbitrary line creates dissension instead of convenience," he said.

John Hammerstrom and his wife, Diane Marshall, own property

calls from people south of Mile Marker 97 who want to be known as Key Largo, not Tavernier."
sgbhs@keysnews.com.

Joey, Maurie and Jill
Services will be held at 10 a.m. today at Dean-Lopez Funeral Home. Burial will follow at 11 a.m. at the Key West Cemetery.

After a public airing of concerns, those in attendance agreed to the change.

The Livable CommuniKeys program is the county planning

into six-mile areas to make the job of charging the master plan easier.

Key Largo is too long an area for her small-staffed department

## COOPERS BODY SHOP
Nobody Does it Better
294-5581

## KEY LIME PIE & SANDWICH CO.
Home of Don't Mess
Key Lime Pie
Daily 8am - 10pm
294-9118 · 500 Truman

## Buddie's
OFFICE SUPPLY
MicroSizers
(2 inch Remote Control Cars)

## Club Body Tech
6 MONTH SPECIAL
$295.00 + tax
292-9683

## NOW MOBILE
* DR. GROSS *
House Call Vet!
(305) 294-5581
Call
www.adoptionflorida.org

## **ADOPTION**
Living and medical expenses paid. Free counseling. Loving, stable, financially secure families wish to give best life can offer to your child. Adoption designed to meet your needs. Confidential. Ginger S. Allen, Attorney. #57215.
Call 800-348-0467
www.adoptionflorida.org

## FREE Fall Fe
Glad Tiding
Thursday, Oct. 31 from
Parents bring your children to a safe & fun HALLOW!
Plenty of CARNIVAL GAM
FACE PAINTING, E
FREE HOT DOG MEA

to get back to shore. He was

The drowning would be the

two to five inches of rain fell
on parts of the Panhandle dur-

without power in Escambia and
Santa Rosa counties.

# OBITUARIES



meet me at goldmans

love bagels + breakfast, lunch?
29¢ deli
daily breakfast special $2.95

MEDLISTO

## PATRICIA LORETA PIODELA PRIDGEN

Patricia Loreta Piodela Pridgen, formerly of Key West, passed away in Wilmington, N.C. on Aug. 31, 2002.

She is survived by her children; Debrah Daughtry and husband, Philip Daughtry; William Hastings Monteath and wife, Melynda Monteath, Anthony Pridgen and wife, Toni Pridgen and Scott Pridgen; grandchildren, Rhiannon Daughtry, Rebecca Daughtry Anthony Monteath, Emilie Monteath, and Allison Pridgen; sister, Faye L. Piodela Garcia, of Key West and brother, William Hastings Piodela Jr. of Winston-Salem, N.C.

Survivors also include nieces and nephews, Faye Lamonte Haynes, Chris Garcia, Mark Garcia, Michelle Garcia, Gregory Piodela, Michelle Garcia, Valerie Piodela, and William Piodela III.



Pridgen

## ALTON "WAYNE" ROBERTSON

Alton "Wayne" Robertson, 52, passed away peacefully at home, Aug. 7, 2002 with his partner by his side. Wayne's wishes were to be cremated and to have his friends and family gather for a memorial service to celebrate his life. Services will be held 6:30 p.m. Monday, Sept. 16, 2002, at St. Paul's Episcopal Church. In lieu of flowers please make donations in memory of Wayne to Hospice of the Florida Keys, 1319 William St., Key West FL 33040.

Arrangements by Dean & Sons Funeral Home/ Cemetery and Cremation Services of Big Pine Key.

## ANNA H. LANNON

Anna H. Lannon, 89, of St. Augustine, Fla., passed away Sept. 14, 2002 at Lower Keys Medical Center.

# VIAGRA

WE WRITE AND FILL YOUR PRESCRIPTION
EXPERT NATIONWIDE AT LOW PRICES
KEY WEST OUTLET FOR IMMEDIATE PICK-UP
FREE SHIPPING TOLL FREE 1-888-493-0256
WWW.PRESCRIPTIONSKEYWEST.COM
PROPECIA / PROSCAR / ACYCLOVIR
525 CAROLINE ST, KEY WEST 292-1917

Anna was a retired elementary school teacher. She moved here from St. Augustine, Fla., and was American Auxiliary Legion four times, and the Legion's state historian. She was president of the Lincoln Teachers Association, chairperson of Easter Seals and Providence March of Dimes. She was also a leader in St. Judes Catholic Church Sunday School.

Anna was a retired elementary school teacher. She moved here from St. Augustine, Fla., and was formerly of Saylesville Lincoln, R.I. Anna was born Jan. 14, 1913, in Providence R.I., the daughter of John F. and Annie V. Lannon. She resided at 61 Reed Ave., Saylesville Lincoln, R.I., for 77 years prior to moving to Florida. Following graduation from St. Xavier High School, she attended and graduated from Rhode Island College of Education (now Rhode Island College) Her initial teaching assignment was at Prospect Hill Elementary School. She ultimately became principal of Fairlawn, Lincoln and Lonsdale elementary schools. As she taught, she studied. She earned a master's degree from Sussex University, and performed graduate work at Boston University, Assumption College, the University of Rhode

Island, and Providence College. She was president of Post 33 American Auxiliary Legion four times, and the Legion's state historian. She was president of the Lincoln Teachers Association, chairperson of Easter Seals and Providence March of Dimes. She was also a leader in St. Judes Catholic Church Sunday School.

Anna was a founding member, president and member of the board of directors of the Lincoln Town Employees Federal Credit Union.

Upon retirement she was the first president of the Blackstone Valley Retired Teachers Association, and vice president of the statewide Rhode Island Retired Teachers Association. In Anna's later years much of her time was spent as a caregiver to several elderly friends who required assistance. Anna's last year was spent in Key West with her nephew Michael Lannon.

Survivors i
John Lannon.
and wife Be
niece Cara, a
and grand n
earthly-restri
columbaria
church, St. A
Church in Sr.
Arrangemen
in Key West.
Funeral Hom
Cremation Se
Key, Fla.



HOGfish
Bar Grill

COMING SOON!

The Goodrich Families

G & M
Collision Repair Center

Insurance Claims Handling
EXPERT COLLISION
REPAIR BENDING
Discount & AUTO Glass
24 HR TOWING &
UNLOCK SERVICE
296-6485

Don't Be Fooled All Repair
Facilities Are Not The Same

wodu t

All@WesleyHo_
Deimi Good F
Citizen, DJ's
Emmet & Ray
Kelly@Design_
Antonia's, Jo I
Coca Cola, Ar
Funding, Nick,
Marketing, Che
@Wex, Old T
Cafe, Neptune
@SFP,Records,
Mindy@Darin D
National Dist.,

Downloaded... KW Documents... Entered on October 11, 2005... Page 68 of 81

held a special place in his heart, especially for the champion basketball team, of which he was a member. He continued his education at Emory University (Dean's List), the University of Florida and on scholarship to University of Miami Law School, where he graduated in 1968. He was admitted to the Florida Bar in 1969, and the Colorado Bar in 1972. Joseph was awarded an honorary Larimer County Sheriff's Badge for assistance to the department. He was admitted to practice before the Eleventh Circuit Court of Appeals, The Eleventh Circuit Court of Appeals, and the United States District Courts, Southern, Middle and Northern Districts of Fla. Joseph worked for over 11 years as an Assistant County Attorney with the Monroe County Attorney's Office, where he won approximately a dozen appeals in the Third District Court of Appeals and one appeal in the Florida Supreme Court. He also previously filed a brief with the U.S. Supreme Court. His knowledge and dedication to his job saved the people of Monroe County untold thousands of dollars. Joseph treated all people equally and with respect. His charm, fairness and sense of humor will be remembered by all.

He is survived by his wife of 30 years, Ann (Wright), his mother-in-law, his five brothers-in-law and their wives, several aunts, uncles and cousins and many close and special friends from across the country.

A small oceanside memorial was held on Oct. 27, 2002.

Because of a lingering guilt over a stolen library book, in his youth, donations can be made in his name to either the Monroe County Library or the Miami Beach Library.

## Appalachian

State University in N.C. He was an athlete, sports fan, adventurer and traveler. Truly one of the most selfless people any of us have ever known, Bob always put his family, friends and fellow man before himself. In his work, he turned many of Key West's residents' dreams into realities — from the very smallest to the largest.

Bob is survived by his wife, Lynn; daughter, Katie; son, Kevin; mother, Dotty; father, Bill and his brothers Jeff and Bill.

From 4 p.m. until 7 p.m. Sunday, Bob's family would like to invite all of his friends and associates to an informal gathering at one of his favorite places, the Key West Golf Club, to celebrate his life and the good times we had with him... the way he wanted it.

Arrangements by Dean-Lopez Funeral Home and Crematory.

### DONALD CORMACK

Donald Cormack, born Nov. 3, 1909, in Philadelphia, Penn., died Oct. 21, 2002 at the Key West Convalescent Center.

The son of James and Janet G. Cormack, he moved to Key West from Pinellas Park, Fla., at the age of 9. He attended schools in Key West, Montverde, Fla., and Oklahoma.

He was preceded in death by his wife, Anna Rose Gandolfo who preceded him in death in 1986, and daughter, Ruth Bello.

He was employed by the city of Key West as a police officer. He also worked in the Work Progress Administration. Later, he was employed by the Navy Civil Service Survey Crew, A&B Fish Market, Lowe's Fish Co., the Key West Sanitation Dept., Monroe County Property

## children and several nieces and nephews.

Visitation will be from 1 p.m. to 2 p.m. Tuesday at the First Congregational Church, 527 William St., with funeral services following at 2 p.m. The Reverend Ron Paige will officiate. Burial will follow at Southern Keys Cemetery, Big Coppitt Key.

In lieu of flowers, the family has requests donations be made to the American Cancer Society, Memorial Donation Department, 2502 B. Roosevelt Blvd., Key West, FL 33040, or Hospice of the Florida Keys, 1319 William St., Key West, FL 33040.

Arrangements by Dean & Sons Funeral Home Cemetery and Cremation Services of Big Pine Key.

### CMDR. RICHARD HILMAN SMITH

Cmdr. Richard Hilman Smith passed away on Oct. 24, 2002. Cmdr. Smith was born in Cincinnati, Ohio, on July 10, 1932, and was the son of Henry Hilman Smith and Eugenia Louise Schmidt Smith.

Smith

Cmdr. Smith attended Wabash College in Crawfordsville, Ind., and the University of Florida, and was a member of Delta Tau Delta fraternity. In 1955, he was commissioned a Naval Aviator flying the DC-3, DC-4, Super Constellation, P2 Neptune and P3 Orion during his 23-year career in the Navy. In 1978, Cmdr. Smith retired in Key West, where he was a fixture at the Key West Yacht Club, a member of the Quiet Birdman and the Association of Naval Aviation.

He is survived by his daughter

West, Ga., and his beloved golden retriever, Orion.

A memorial gathering celebrating his life will be held at a later date. In lieu of flowers, the family asks that donations be made to the Everglades Golden Retriever Rescue Inc., 11930 NW 29th Place, Sunrise, FL 33323.

### GWENDOLYN JOY ATKINS

Gwendolyn Joy Atkins, 87, passed away Wednesday, Oct. 23, 2002, at Lower Keys Medical Center. Mrs. Atkins was a longtime resident of Key West, Fla., coming from Petersburg, Ill.

Visitation will be from 2 to 4 p.m. Monday in the Castillo & Thurston Chapel at Whitehead Street and Truman Avenue in Key West. Funeral services will be 4 p.m. Monday in the chapel, with a Jehovah's Witness Kingdom Hall elder officiating. Burial will be in Chicago, Ill.

Arrangements by Castillo & Thurston's Key West Mortuary.

### GEORGE S. STEVENS

George S. Stevens, 59, passed away Friday, Oct. 25, 2002, at his Key West residence. Mr. Stevens was a longtime resident of Key West, coming from Midway, Ga.

Visitation and funeral services will be in Georgia under the direction of Dorchester Funeral Home, Midway, Ga.

Local arrangements by Castillo & Thurston's Key West Mortuary.



AVANCED Cleaning Systems
A/C Duct
Tile • Grout • Carpet
Upholstery Cleaners
10% OFF SPECIAL
100% SATISFACTION GUARANTEED • 294-1919



VIAGRA
WE WRITE AND FILL YOUR PRESCRIPTION
NO CONSULTATION FEE • LOWEST PRICES
KEY WEST OUTLET FOR CONVENIENT PICK UP
FREE SHIPPING CALL FREE 1-800-xxx-xxxx
SEE OUR PAGES AT
WWW.PRESCRIPTIONSKEYWEST.COM
PROPECIA / PROSCAR / ACYCLOVIR
829 CAROLINE ST. 292-1917

KEY LIME PIE & SANDWICH CO.
Home of Rima's Mom's
Key Lime Pie
Daily 8am - 10pm
294-9118 · 500 Truman

KW HAIRCUTS
BY JENNY
MEN'S CUT $10 · LADIES' CUT $12
SPECIALIZING IN PERMS, COLOR & HIGHLIGHTS
1111 N. ROOSEVELT BLVD.
(K-MART SHOPPING PLAZA)
294-8384

ISLAND GYMNASTICS
Ages 9 months & up
BIRTHDAY PARTIES TOO!
Saturday night open gym
600 White Street • 295-0101

AUG-06-2002 TUE 10:26 AM    DEAN LOPEZ FH              3052968572              P. 01

# OBITUARIES

## LOUISE CARTER ROBINSON

Louise Carter Robinson, 85, of Key West, died August 2, 2002, at the Lower Keys Medical Center.

A native of Pavo, Ga., she had been a resident of Florida for 51 years, formerly residing in Fort Pierce and Okeechobee.

She was a founding member of the Humane Society. She joined with other animal-rights groups to sponsor the petition drive. Ruskin has said 14 in the last five of the kind in the country.

Florida is 30th in the nation in hog production. The behind leaders like Iowa, North Carolina and Minnesota, none of which have a citizen initiative, said. And only a couple of child drives, and ...

...

## JAMES A WHITE

The son of The Great James White, 78, passed into the wild blue yonder on Aug 4, 2002, after an extended illness.

A former private pilot and avid radio-controlled model airplane...

**GUN FOR HIRE**
Machinist & Training
call JOE 294-4546

**KEY LIME PIE & SANDWICH CO**

**Willie T's**
525 DUVAL
FOOD 'til 2AM

**Internet Business Directory**
Over 180,000 people visit
hqbiznews.com
each month.

**PUBLIC NOTICE**

**HELP SAVE OLD TOWN**
www.hvadicoldtown.com

**COOPERS BODY SHOP**
Nobody Does it Better
294-5581

**Dean-Lopez Funeral Home**
Serving all of the Florida Keys
305-294-1956

**Dean & Sons Funeral Home**
Cemetery and Cremation Services
Representing the 4th & 5th Generations of Funeral Service Providers in Monroe County

**CALL TODAY AND WE WILL PROVE IT!**

# COMPOSITE EXHIBIT "E"

grams, and new services and
...ble the club to recruit new
...mbers, said Arianna Nesbitt.

...mizing youths primarily from
disadvantaged circumstances.

...the Dolphin Research Center
Dolphin Day Trips are pro-
grams that offer a variety of
educational opportunities
through observation of training
sessions, seminars, demonstra-

...dents from elementary school
age to college level, as well as
youth organizations. Bookings
must be made a month in
advance.

To find out more, call DRC
at 289-1121.

# ...ets fresh foliage

...union on the island when the
...thouse served as a vital navi-
...ion aid to 19th century
...iners.

The planting of indigenous
...cies, including buccaneer
...ns, lignum vitae and gumbo-
...bo was funded by the
...nroe County Tourist
...elopment Council.

...Completed in 1848, the light-
...se guided seafarers through

the treacherous Key West waters
until it was decommissioned in
1969. It is the only U.S. light-
house constructed in the middle
of a city. Now it is a historical
attraction operated by the Key
West Art and Historical Society.

Visitors can climb an 88-step
spiral staircase to the light's
watchroom for a panoramic view
of the island, step inside a 12-
foot "first order" lens manufac-
tured circa 1858, learn the sto-
ries of two courageous female
lighthouse keepers and see his-
toric artifacts, photos and jour-
nals.

The Key West Lighthouse
Museum is open daily 9:30 a.m.
to 4:30 p.m. Admission is $8 for
adults, $6 for seniors and local
residents, and $4 for students
and children. Call 295-6616.

## ...ry

...cial training in human rela-
...s.

...n addition, airmen who com-
...e basic training earn credit
...ard an associate degree
...ough the Community College
...the Air Force.

...Hester is the daughter of
...omas and Helen Hester of
...Largo. She is a 2000 gradu-
...of Coral Shores High
...ool.



**HILL / NARDONE**
MM 50.5 in Gulfside Village, Suite 17
305-743-9292 • 888-825-9292

EXIT REALTY FLORIDA KEYS

**Voted
Marathon's
Favorite Real
Estate Office
2000 & 2001**

**FULL-TIME
PROFESSIONALS
FOR FULL-TIME
PROFESSIONAL
SERVICE**

**RENTALS**
305-743-0235
888-440-0235
305-743-4227 Fax

NOW OPEN IN TAVERNIER

fLoRida KEYS Rentals

...RIED

Gary Portell and
Dottie Staples,
former Big Pine Key
residents, were
married Aug. 24 at
their new home in
Bartow. Longtime
friend Linda Allen
performed the
ceremony. Best man
was Joe Allen, and
the bride's mother,
Billie Remensnyder,
also attended.

# The First Name in Family-Owned Funeral Services Announces Our New Business

The Dean family continues a tradition as the first name in affordable, personalized funeral services for families in the Keys that started over 130 years ago. Today, Jeffrey W. Dean and family is proud to announce the opening of our new facility.

We are no longer associated with the Simonton Street business our family created and nurtured through the years. Our new Big Pine location, from which we can serve all of Monroe County, allows us to continue to provide the family-oriented, person-alized services our family is known for AND NOW WE OFFER CEMETERY SERVICES AS WELL.

Our long-standing relationships allow us to offer services in places of worship for all denominations throughout the Keys. When a time of need arises, think of the first name Keys families have turned to for four generations.

31140 Overseas Hwy., Big Pine, FL 33043 • (305) 872-2929 • Fax 872-2965 • Cell 797-6557

## DEAN & SONS FUNERAL HOME
### Cemetery and Cremation Services, Inc.
*The family you've trusted for over a century*

24 Hour Service • All Faiths & Races • Worldwide Transport Service

**EXHIBIT**

COMPOSITE
"E"

SEP-12-2002 THU 09:49 AM    DEAN LOPEZ FH              3052968572              P. 01

uld      "Since Sept. 11, they have had      Fyles said that local boaters      Florida Keys and Key West has
said    to curtail tours to the public," he      need to give the Truman a wide      sent out notices to its members,
"nis-   said, "There will be some visits by     berth while it's here.               announcing the windfall of 5,000
first   local officials, though."                  "Boaters are asked not to        visitors during a notoriously slow
"ita-      In addition, the Navy League       approach the vicinity of the carri-   period. Some hotels, bars, restau-
"ane-   and Military Affairs will be host-   er," said Fyles. "There will be       rants and attractions are offering
        ing a reception for the ship's offi-  picket boats around the vessel and    specials to the crew before they
        cers on the evening of Sept. 28,      the Coast Guard will also help        embark upon their next mission.

## UNFORGETTABLES
### *Antiques, Vintage, Deco*

*"We're not just another antique store"*

*New, Vintage & Children's Linens • New Bedding*
*Unique Lighting & Hardware • Housewares*
*Furniture (including children's) • Collectables of all kinds*
*Private appointments available*

Located in the Galleria of Islamorada - mile marker 80.9 (305) 664-3363
Open Tuesday thru Saturday 10 - 6 (Occasionally Sunday & Monday)

*Try our European Sleep System*

## The First Name in Family-Owned
### Personal Services Announces
### A New Direction

The Dean Family, providing quality
funeral services to families in the Keys that started over 130 years ago. Today,
Jeffrey W. Dean and family is proud to announce the opening of our new facility.

We are no longer associated with the Simonton Street business our family created
and nurtured through the years. Our new Big Pine location, from which we can serve
all of Monroe County, allows us to continue to provide the family-oriented, person-
alized services our family is known for AND NOW WE OFFER CEMETERY SERVICES
AS WELL.

Our long-standing relationships allow us to offer services in places of worship for all
denominations throughout the Keys. When a time of need arises, think of the first
name Keys families have turned to for four generations.

31140 Overseas Hwy., Big Pine, FL 33043 • (305) 872-2929 • Fax 872-2965 • Cell 797-6557

## DEAN & SONS FUNERAL HOME
### Cemetery and Cremation Services, Inc.
*The family you've trusted for over a century*
24 Hour Service • All Faiths & Races • Worldwide Transport Service

# y Internet          T1 - $99/mo
                      with FREE Web Hosting

            Wireless Broadband from $39.95/mo
            DSL Broadband from $45/mo
or Less

AUG-24-2002 SAT 01:12 AM    DEAN LOPEZ FH          3052968572              P. 01
Aug 23 02 09:17p

*[handwritten] Sent To*
*JUDY Brown 8/27/02*

---

## The First Name in Family-Owned Funeral Services Announces Our New Business

The Dean family began a tradition as the first name in affordable, personalized funeral services for families in the Keys over 130 years ago. Today, our entire family is proud to announce the opening of our new, expanded facility.

We are no longer associated with the Simonton Street business we created and nurtured through the years. Our new Big Pine location, from which we can serve all of Monroe County, allows us to continue to provide the family-oriented, personalized services only a locally owned and operated funeral service provider can. And we have expanded to include cemetery services as well.

Our long-standing relationships allow us to offer services in places of worship for all denominations throughout the Keys, or in the comfort of your own home. When a time of need arises, think of the first name Keys families have turned to for three generations.

31140 Overseas Highway • Big Pine, FL 33043 • (305) 872-2929

## Dean & Sons Funeral Home

## PERMITS FOR STORES, OFFICES AND RESIDENCES

on your Vacant Lot or Redevelop an Existing Property

## I DO ALL THE WORK

### COMMERCIAL BUILDING APPLICATIONS IS OUR SPECIALTY 744-0565

## NOTICE OF MEETING

NOTICE IS HEREBY GIVEN TO WHOM IT MAY CONCERN that there will be a meeting of the Upper Keys Health Care Taxing District Advisory Board as follows:

DATE: Monday, September 23, 2002    TIME: 8:30 AM
PLACE: Mariners Hospital, 91500 Overseas Highway, Tavernier, FL

Rollback is the millage rate the county would need to charge to collect the same amount of taxes as last year.

"The county's portion of that rate — the general fund — began at 13 percent over rollback, and now we're at less than 3 percent," said Roberts.

In actual dollars:

❏ Property owners in taxing District 1 — the unincorporated area from Stock Island to Tavernier — can expect to see an increase of about $40 per $100,000 assessed value.

❏ Unincorporated Districts 6 and 7 — above mile marker 95 — can expect an increase of $14 to $18 per $100,000 of assessed value.

❏ The municipalities except for Layton can expect, on top of their city tax bills, to pay an extra $20 per $100,000 of assessed value.

❏ Layton residents will be facing an increase of $46, in addition to their city taxes.

Even though the millage rate was cut back significantly since

## The First Name In Family-Owned Funeral Services Announces Our New Business

The Dean family services all different faith's and denominations. We have provided funeral services for families in the Keys that started over 130 years ago. Today, Jeffrey W. Dean and family is proud to announce the opening of our new facility.

We are no longer associated with the Simonton Street business our family created and nurtured through the years. Our new Big Pine location, from which we can serve all of Monroe County, allows us to continue to provide the family-oriented, personalized services our family is known for AND NOW WE OFFER CEMETERY SERVICES AS WELL.

Our long-standing relationships allow us to offer services in places of worship for all denominations throughout the Keys. When a time of need arises, think of the first name Keys families have turned to for four generations.

31140 Overseas Hwy., Big Pine, FL 33043 • (305) 872-2929 • Fax 872-2965 • Cell 797-6557

## DEAN & SONS FUNERAL HOME
### Cemetery and Cremation Services, Inc.
*The family you've trusted for over a century*

24 Hour Service • All Faiths & Races • Worldwide Transport Service

"ALL" of Monroe Co.

"throughout the Keys"

The Key West Citizen
1st Ad
July 28, 2002
August 14, 2002

## PUBLIC NOTICE

### Dean & Sons Funeral Home
### Cemetery and Cremation Services

Jeffrey W. Dean & Family Are No Longer Affiliated
With Dean Lopez Funeral Home.

Our Family has provided Affordable Personalized Family Services To All Of The Florida Keys For Over 100 Years. The Tradition and Values of Caring for Your Family, Just Like They Were our Own Family, Continues.

It Always has Been A Privilege To Be Trusted By You, At Your Most Difficult Moments. Now With the Opening of Our New Funeral Home and Cemetery, We Can Serve Big Pine, Marathon and All the Middle and Lower Keys Better.

Arrangements Can Be Made In the Comfort of Your Own Home or At Our Funeral Home On Big Pine Key.

We Will Be Opening A Funeral Chapel & Office In Marathon Soon.

Please Give Us A Call & Let Us Help You When You Need Our Guidance.

- 24 Hour Service
- Serving All Faiths & Races
- Memorial Services
- Funeral Services
- Cemetery Services
- Simple Cremation Services
- Worldwide Shipping

31140 Overseas Hwy., Big Pine Key, FL 33043
Ph. 305-872-2929     Fax 305-872-2965

five member 100 Key Largo Monroe, Dave Shiz SD members Anne Kelly Collins, Wastewater Board: Gary Spitznugel, Max Telhiard, Eileen Quinn and Debra S. Bauman, Cris Beaty, Jack Andrew Tobin and Jerry Walker are unopposed. Bondus, Charles "Chuck" Wilkinson The qualifying period for all Brooks, Claude Bullock, local candidates ended Friday at Michael A. Commerford, noon. Howard A. Gelbman, Kari-Astrid Haugeto, Richard "Dick"

**School Board**

• Incumbent school board

ghaller@keysnews.com



# PUBLIC NOTICE

## Dean & Sons Funeral Home Cemetery and Cremation Services

### Jeffrey W. Dean & Family Are No Longer Affiliated With Dean Lopez Funeral Home.

Our Family has provided Affordable Personalized Family Services To All Of The Florida Keys For Over 100 Years. The Tradition and Values of Caring for Your Family, Just Like They Were our Own Family, Continues.

It Always has Been A Privilege To Be Trusted By You, At Your Most Difficult Moments. Now With the Opening of Our New Funeral Home and Cemetery, We Can Serve Big Pine, Marathon and All the Middle and Lower Keys Better.

Arrangements Can Be Made In the Comfort of Your Own Home or At Our Funeral Home On Big Pine Key.

We Will Be Opening A Funeral Chapel & Office In Marathon Soon.

Please Give Us A Call & Let Us Help You When You Need Our Guidance.

- 24 Hour Service
- Serving All Faiths & Races
- Memorial Services
- Funeral Services
- Cemetery Services
- Simple Cremation Services
- Worldwide Shipping

17 • Free Press • July 31, 2002

AUG-08-2002 THU 10:55 AM   DEAN LOPEZ FH                    3052968572                    P. 01



For the latest updates on storms, log on to keysnews.com/ stormcentral

**HURRICANE SEASON 2002**



ROB ONEAL/The Citizen

Key West Police Sgt. Alfredo Vasquez, 37, is a native Conch who works the day watch. Vasquez loves Key West's atmosphere, the nice people, and believes living in Key West offers a great way of life.

# Marathon adds hook-ups to Little Venice

BY TRAVIS TRITTEN
Citizen Middle Keys Bureau

About 200 homes and businesses were chosen Tuesday for the second phase of the Little Venice sewer project in Marathon.

The neighborhood between 107th Street and 113th Street that sits across U.S.1 to the north of Little Venice will be added to the project, Marathon officials and the county's wastewater authority decided. That area is bordered by the Gulf to the north, and U.S.1 and First Avenue to the south.

The addition might be put out to bid by December or January, and could cost about $3 million, said Paul Feldman, director of

environmental services for the Florida Keys Aqueduct Authority.

The Marathon City Council has said the added customers will drive down sewer fees, and is also angling for $1.2 million in state aid to offset costs for the new project. The city must put the project out to bid by March

2003 to be eligible for the grant money.

Little Venice and the addition are the first projects of a planned citywide central sewer, which has been estimated at $76 million and must be completed by 2010.

ttritten@keysnews.com





**The Goodrich Families**

**G & M**

**Collision Repair Center**

Insurance Claims Handling
EXPERT COLLISION REPAIR, & REFINISHING
Discount Auto Glass
24-HR. TOWING & UNLOCK SERVICE

Don't Be Fooled! All Repair Facilities Are Not The Same.

**296-6485**

**Dean-Lopez Funeral Home**
serving the Keys since 1869

• Funeral arrangements made at your residence in Marathon or in our private free limousine service to our Chapel
• Offering complete Traditional Funerals in Marathon
• Cremation Service
• World Wide Shipping Service

Funeral Directors available 24 hours
Serving all of the Florida Keys
305-294-1066



**NOW MOBILE**
**DR. CROSS**
**House Call Vet!**
(305) 294-9551
Call today for an appointment
Same friendly service at your doorstep!



**PUBLIC NOTICE**

Dean & Sons Funeral Home Cemetery and Cremation Services

Representing the 4th & 5th Generations of Funeral Service Providers In Monroe County

Jeffrey W. Dean & Family Are No Longer Affiliated With Dean Lopez Funeral Home, Pritchard Funeral Home, or any Key West Funeral Home.

For:
• Low Cost Cremation
• Low Cost Funerals
• Low Cost Worldwide Shipping

Please give me a call
Tel. 305-872-2929
Fax 305-872-2965
31140 Overseas Highway
Big Pine Key, FL



**ON THE LOOSE...**
**50 YEAR OLD**
**LION MAN!**

Happy Birthday to a Lucky Leo
Neil, you are SO LOVED by Your Wife, Wolf, Oso & Cub Trio!
~ Donna, Arielle, Noah & Nicholas



**Remarkable New "NO DOCUMENTATION" Mortgage Program**
With Excellent Interest Rates!
(PURCHASE OR REFINANCE)

We WON'T ask where you work, how long you have worked or how much you earn!

We WON'T ask where you bank or how much is in your accounts!

We WON'T ask for tax returns, W-2's, paystubs or bank statements.

We WILL need to verify that you have established a reasonably good credit history (does not have to be perfect).

We WILL require that you have a pulse and are breathing at time of closing.

The response to this new program has been tremendous, but some people have been skeptical. We have now closed over a dozen mortgage loans under this program and it is all true!

Plus, the interest rates are SURPRISINGLY LOW!!!

CALL TODAY AND WE WILL PROVE IT!

Oliver Blake Mortgage, Inc.
292-9982 or 745-1540



**PUBLIC NOTICE**

Dean & Sons Funeral Home
Cemetery and Cremation
Services

*Representing the 4th & 5th*
*Generations of Funeral*
*Service Providers in*
*Monroe County*

Jeffrey W. Dean & Family
Are No Longer Affiliated
With Dean Lopez Funeral
Home, Pritchard Funeral
Home, or any Key West
Funeral Home.

For:
• Low Cost Cremation
• Low Cost Funerals
• Low Cost Worldwide Shipping

Please give me a call
Tel. 305-872-2929
Fax 305-872-2965
31140 Overseas Highway
Big Pine Key, FL

multipl
ng ev...
I have a
ke to sell

g that the
of direc-
ent of the
property
r 60 per-
ple prop-
. He did
re are no
ne board,
they con-

ven has a
tel"

gnature,
P.O. Box

r

employ-
another
truck
urssing
elter and
tiff's
orney's
ability of
nembers
rk
ial man-
fonroe
a whole
to con-

dered
lly with
cies and
he crit-
n and
pe of
ill not
County
uded the
ve with
: "This

teekle.

"it is a challenge, and...
nothing whatsoever."

One problem, he says, is nobody knows how many men might need special housing.

About 300 of the roughly 46,000 U.S. priests have resigned or been taken off duty this year over abuse allegations, including at least 50 since the Dallas meeting. What happens next to those men now falls into three categories:

• An abuser can request "dismissal" from the clerical state," commonly known as defrocking.

Each case requires Vatican approval, but under the current streamlined administrative process and may revisit this topic at their Nov. 11-14 meeting in Washington.

• A molester can be barred from functioning as a priest without dismissal from the priesthood. The June policy says this will apply especially "for reasons of advanced age or infirmity" and such men will lead "a life of prayer and penance."

With either voluntary or involuntary dismissal, a man "no longer has any priestly obligations to the church or the church toward him," says Monsignor

under the regimen of a monastic community and "a vocation doesn't come from being an offender."

"Monasteries simply won't be open to such things," he says. "It would wreck the monastic structure."

The other option is special long-term residences, sometimes called "houses of confinement," for those, as Kiley puts it, who are "removed permanently from ministry" and yet want "in some way to live their life out as priests."

8/4/02

**PUBLIC NOTICE**

## Dean & Sons Funeral Home
## Cemetery and Cremation Services

**Jeffrey W. Dean & Family Have Opened Dean & Sons Funeral Home Cemetery and Cremations Service to Better Serve All of Monroe County.**

*I have served Key West for 25 years and Will Continue to Provide a Full Range of Funeral Service Needs, Now from Big Pine Key to Serve All the Florida Keys.*

*Our Family has provided Affordable Personalized Family Services To All Of The Florida Keys For Over 100 Years. The Tradition and Values of Caring for Your Family, Just Like They Were our Own Family, Continues.*

*It Always has Been A Privilege To Be Trusted By You, At Your Most Difficult Moments, Now With the Opening of Our New Funeral Home and Cemetery, We Can Serve Big Pine, Marathon and All the Middle and Lower Keys Better.*

**Arrangements Can Be Made in the Comfort of Your Own Home or At Our Funeral Home On Big Pine Key.**

*We Will Be Opening A Funeral Chapel & Office in Marathon Soon.*

*Please Give Us A Call & Let Us Help You When You Need Our Guidance.*

• 24 Hour Service • Serving All Faiths & Races
• Memorial Services • Funeral Services • Cemetery Services •
• Simple Cremation Services • Worldwide Shipping •

**31140 Overseas Hwy., Big Pine Key, FL 33043**
**Ph. 305-872-2929 • Fax 305-872-2965**

FLAG

Cheese Blintz wi
Bac
Bis

Make

Our Chef p

Crisp Romaine L

Mixed Baby L
Shredded Carro

Smoked Salmon

Seafo

Feat

ems a shame to waste a wonderful existing sports site with venue generating potential.

I can envision a peaceful, scenic park with various water oriented and personal fitness activities that could generate enough income from concessions and user fees to cover much of the cost. The sports fields can stay on inland properties. It appears that instead we will all be paying more for additional team sports fields that a small minority desires while we destroy the character of the Mariners Resort neighborhood and waste a valuable resource. When did democracy die?

John Prosser
Big Pine Key

## Swift: Businesses pay for tax cap loophole

**Dear Editor:**

For many years I was an advocate of capping tax increases at three to four percent on ad val-

the customers). In an expanding economy, businesses that happened and until Sept. 11, com-

See LETTERS on Page 7

# Chicago Title

## OF THE FLORIDA KEYS

### "The BEST of the Best!"

• Customer Service that surpasses the rest • Experienced, knowledgeable & friendly staff • National Underwriter • 1031 Exchange Program

*Offices Opening Soon in KEY WEST and BIG PINE KEY.*
*May be reached immediately at (305) 294-0100.*



## Key Tiki Bar

### Every Wednesday Nite is Karaoke!

MM 27.5
Ramrod Key
872-2215

DAILY REEF TRIPS

SORT & DIVE CENTER

GUST 31

## Dean & Sons Funeral Home

### Cemetery and Cremation Services

Jeffrey W. Dean and family are no longer affiliated with Dean-Lopez Funeral Home. Our family has provided affordable, personalized family services to all the Florida Keys for over 100 years. The tradition and values of caring for your family, just like they were our own family, continues.

It's always a privilege to be trusted by you at your most difficult moments. Now with the opening of our new funeral home and cemetery we can serve Big Pine, Marathon and all the Middle and Lower Keys better.

*Arrangements in the comfort of your own home or at our Funeral Home on Big Pine Key.*

Please give us a call and let us help you when you need our guidance.

30140 Overseas Highway
Big Pine Key, FL 33043
Phone 305-872-2929
Fax 305-872-2965

JS 44

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

02-10089

**1 (a) PLAINTIFFS**

ALDERWOODS GROUP, INC. f/k/a LOEWEN GROUP INTERNATIONAL, INC., a Delaware corporation,

**DEFENDANTS**

JEFFREY W. DEAN, AN INDIVIDUAL AND DEAN & SONS FUNERAL HOME, CEMETERY AND CREMATION SERVICES, INC., A FLORIDA CORPORATION,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF LISTED DEFENDANTS Monroe County, Florida
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Key west — 02CV10089 Brother/Lynch

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
JASON M. MURRAY
Florida Bar No. 912336
CARLTON FIELDS, P.A.
4000 International Place
100 S.E. Second Street
Miami, Florida 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055
E-Mail: jmurray@carltonfields.com

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE LYNCH

MAGISTRATE JUDGE SELTZER

**(d)   CIRCLE COUNTY WHERE ACTION AROSE:**
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

☐ 1  US Government Plaintiff

☐ 2  U.S. Government Defendant

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Case Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizenship of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. SECTIONS 1121, 1125.  THIS IS A SUIT FOR TRADEMARK AND TRADE NAME INFRINGEMENT.  THE SUIT INVOLVES FALSE DESIGNATION OF ORIGIN AND MISREPRESENTATION UNDER § 43(a) OF THE LANHAM ACT.

**IVa:** 4 days estimated (for both sides) to try entire case

**V.   NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A  CONTRACT | A  TORTS PERSONAL INJURY | TORTS PERSONAL INJURY | B  FORFEITURE PENALTY | A  BANKRUPTCY | A  OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury Med Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | ☐ 630 Liquor Laws | A  PROPERTY RIGHTS | ☐ 450 Commerce/ICCRates/etc. B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 830 Patents | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans(Excl Veterans)B | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | ☐ 660 Occupational Safety/Health | ☒ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | B  SOCIAL SECURITY | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | A  LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor Management. Relations B | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor Management Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| A  REAL PROPERTY | A  CIVIL RIGHTS | B  PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | A  FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure B | ☐ 442 Employment | Habeas Corpus | ☐ 791 Employee. Ret. Inc. Security Act B | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | * A or B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights *A or B | | | |

**VI.  ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Refiled   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII.  REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A   ☐ CLASS ACTION   DEMAND$ _____
☐ UNDER F.R.C.P. 23

☐ Check YES only if demanded in complaint:
**JURY DEMAND:**  ☐ YES  ☒ NO

**VIII.  RELATED CASE(S)** (See Instructions)
**IF ANY**   JUDGE _____   DOCKET NUMBER _____

DATE                SIGNATURE OF ATTORNEY OF RECORD

1.1.1

$150.00   873034